## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Molly Vogt,
*as Trustee for the Heirs and Next-of-Kin of*
*Joshua Vogt, deceased*,

        Plaintiff,

v.

MEnD Correctional Care, PLLC;
Crow Wing County, Minnesota;
Heath Fosteson, individually and in his
capacity as Crow Wing County Jail
Administrator;
CO Robert Anderson;
CO Raynor Blum;
CO Cherokee DeLeon;
CO Christine Ghinter;
CO Ronald J. Imgrund; and
CO Lukasz Organista,

        Defendants.

Case No. 21-cv-1055 (WMW/TNL)

**REPORT &**
**RECOMMENDATION**

Nicholas Sweeney, Brazil Law Group, 1622 West Lake Street, Minneapolis, MN 55408
(for Plaintiff); and

Jessica Schwie, Kennedy & Graven, Chartered, 150 South Fifth Street, Suite 700,
Minneapolis, MN 55402 (for Defendant COs Robert Anderson, CO Raynor Blum, and
CO Ronald J. Imgrund).

## I. INTRODUCTION

    This matter comes before the Court on Plaintiff Molly Vogt's Rule 37(e) Motion

for Default Judgment and Other Sanctions, ECF No. 57. A hearing was held. ECF No.

66. Nicholas Sweeney appeared on behalf of Plaintiff. Jessica E. Schwie appeared on

behalf of Defendants CO Robert Anderson, CO Raynor Blum, and CO Ronald J. Imgrund (collectively, "CO Defendants").[1]  In light of the Court's conclusion on the disposition of Plaintiff's motion, the Court has issued its decision in the form of a report and recommendation to the district court, the Honorable Wilhelmina M. Wright, District Judge for the United States District Court for the District of Minnesota.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**.

## II. BACKGROUND

### A.  Death of Joshua Vogt on January 3, 2022

As alleged in the First Amended Complaint, Joshua Vogt[2] was arrested on January 2, 2020, and transported to the County's jail.  First Am. Compl. ¶¶ 19-20.  Joshua Vogt

---

[1] The CO Defendants are the only remaining defendants in this litigation.  *See generally Vogt v. Crow Wing Cty.*, No. 21-cv-1055 (WMW/TNL), 2022 WL 37512 (D. Minn. Jan. 4, 2022); ECF Nos. 22, 25.  The CO Defendants are or were employed by Defendant Crow Wing County ("the County") at the time of the events giving rise to this litigation.  *See, e.g.*, First Am. Compl. ¶¶ 10, 12-13, 16, ECF No. 67; Answer to First Am. Compl. ¶ 7; *see also* Decl. of Jessica Schwie ¶ 1, ECF No. 53.  Plaintiff brought claims against the CO Defendants in their individual and official capacities as well as against the County.  *See generally* First Am. Compl.  "A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."  *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *accord Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978).  Thus, Plaintiff's claims against the CO Defendants in their official capacities are essentially claims against the County and are therefore subsumed within Plaintiff's claims against the County.  *See Thiel v. Korte*, 954 F.3d 1125, 1129 (8th Cir. 2020) ("The official-capacity claim against Korte is essentially a claim against the county itself.").

Following a prior motion to dismiss, only Plaintiff's claim against the CO Defendants in their individual capacities remains.  *See generally Vogt*, 2022 WL 37512; *see also* First Am. Compl. ¶¶ 31-36 (Count I brought against "all Defendants except Crow Wing County"); Pl.'s Mem. in Supp. at 1-2 ("mov[ing] for reinstatement of [the] County into this lawsuit"), ECF No. 59; *cf.* Defs.' Mem. in Opp'n to Punitive Damages at 2 ("Denying dismissal to only these 3 individual defendants, the court held that dismissal was not available until there was discovery and development of the record as to whether [the CO Defendants] were actually aware of a serious medical need or deliberately disregarded a medical need as apparent to a layperson."), ECF No. 52.  Thus, while the County has not been formally terminated from this litigation, it is no longer a party for all practical purposes.

[2] Plaintiff is Joshua Vogt's daughter.  First Am. Compl. ¶ 6.  The Court will use Joshua Vogt's first and last name to avoid confusion with Plaintiff.

arrived at the jail close to midnight. First Am. Compl. ¶ 20. Upon his arrival, he was transported to the booking area where an officer removed his "handcuffs and performed a pat down search." First Am. Compl. at 20. After this pat-down search, Joshua Vogt "enter[ed] a bathroom by himself from 11:53 PM to 12:03 AM," during which time Plaintiff alleges that Joshua Vogt "ingested two baggies of [m]ethamphetaine that eventually led to his death." First. Am. Compl. ¶ 20. After he was done in the bathroom, Joshua Vogt "showered and changed into orange jail clothing." First Am. Compl. ¶ 21.

Around 12:12 AM, Joshua Vogt "was booked into the" jail by Defendant CO Robert Anderson. First Am. Compl. ¶ 22. During the booking process, Defendant CO Anderson noted on a form that Joshua Vogt "was exhibiting 'tremors, sweating profusely.'" First Am. Compl. ¶ 22. There was a question that asked: "When was the last time you consumed any drugs? What type?" First Am. Compl. ¶ 22. Defendant CO Anderson reported that Joshua Vogt was "[o]n something right now, but he's unsure what he took. He's sweating heavily." First Am. Compl. ¶ 22.

Joshua Vogt remained in the booking area for approximately 20 minutes. *See* First Am. Compl. ¶¶ 22-23. During this time, he "was shaking, sweating heavily and pacing around the room." First Am. Compl. ¶ 23. Shortly after 12:30 AM, Joshua Vogt lost his balance and fell over as he turned to the side for a profile picture. First Am. Compl. ¶ 23. Three County deputies "rush[ed] to assist him." First Am. Compl. ¶ 23.

At some point, Defendant CO Raynor Blum "informed" Defendant CO Ronald J. Imgrund that Joshua Vogt "was on drugs and was shaking violently." First Am. Compl. ¶ 24. Around 12:45 AM, Defendant COs Anderson and Imgrund "carried [Joshua] Vogt

into Court Holding Cell 2." First Am. Compl. ¶ 24. Joshua Vogt was "shaking and not able to walk on his own." First Am. Compl. ¶ 24.

Joshua Vogt was "left alone in the holding cell," where he remained until approximately 1:30 AM, when Defendant CO Imgrund entered the holding cell and noticed he "was incoherent" and "shaking worse than he was earlier." First Am. Compl. ¶ 26. Defendant CO Imgrund "instructed staff to call for an ambulance" and also telephoned an on-call nurse. First Am. Compl. ¶ 27. A few minutes later, Joshua Vogt stopped breathing. First Am. Compl. ¶ 27. Defendant COs Blum and Imgrund began life-saving measures. First Am. Compl. ¶ 27. Emergency medical services arrived approximately six minutes later and took over. First Am. Compl. ¶ 28. Less than an hour later, Joshua Vogt was pronounced dead. First Am. Compl. ¶ 28.

### B. January 3, 2020 Meeting with the County & Autopsy of Joshua Vogt

Later in the morning on January 3, the same day that Joshua Vogt died, members of his family met with a County investigator. Pl.'s Mem. in Supp. at 4; *see* Ex. 39 at 13,[3] ECF No. 53-6. "Portions of this conversation were recorded" and a transcript of this meeting was made by defense counsel. Pl.'s Mem. in Supp. at 4; *see generally* Ex. 39; *see also generally* Exs. 38-1, 38-2 (audio recordings on DVD). During this conversation, the County investigator told Joshua Vogt's family that part of the investigation process involved watching video and that, with respect to the jail, "there's obviously the jail there's not an inch of that facility that's not under constant surveillance." Ex. 39 at 3; *see also* Ex. 39 at 4 ("[B]ut the guys who are on the ground doing the talking, analyzing,

---

[3] Unless otherwise noted, all exhibits are to the Schwie Declaration, ECF No. 53. *See also* Pl.'s Mem. in Supp. at 4 n.1 (referring to exhibits in the Schwie Declaration).

looking, watching the videos and things like that.").  Joshua Vogt's family asked whether they would be able to watch the videos as well and were told by the County investigator that they "eventually" would.  Ex. 39 at 3.

Throughout this conversation, members of Joshua Vogt's family discussed consulting with counsel about the events that happened.  At one point, someone stated: "I think we need to get a hold of somebody."  Ex. 39 at 3; *see also* Ex. 39 at 8 ("I think we need to talk to somebody about that.").  At another point, someone asked the County investigator whether he "would recommend us getting an attorney right now?"  Ex. 39 at 9.  The County investigator responded that he "can't provide legal advice."  Ex. 39 at 9.  Later in the meeting, someone commented: "I think we need to get an attorney and I think we need to talk to some people from not around this county because I believe that things happened and they're trying to cover it up, that's what I think."  Ex. 39 at 10; *see also* Ex. 39 at 11 ("I think we need to go to an attorney").

### C. Second Meeting with County

"A few weeks later," members of Joshua Vogt's family met with another County investigator, which was also recorded.  Pl.'s Mem. in Supp. at 6.  This meeting was likewise transcribed by defense counsel.  Pl.'s Mem. in Supp. at 6; *see generally* Exs. 40, 41.

During this meeting, the County investigator "played portions of the surveillance video."  Pl.'s Mem. in Supp. at 6.  Members of Joshua Vogt's family asked questions about the availability of other video, including the cell "that they took [Joshua Vogt] out of."  Ex. 41 at 3.  The County investigator responded: "The core holding, or the one yeah,

the group holding the first one that they went in.  Not that I'm aware of, I wasn't provided any cameras [inaudible] and I'm sure they would have gave us that one since he was in there."  Ex. 41 at 3.

Joshua Vogt's family continued to press about cameras in the holding cells.  *See* Ex. 41 at 3-4.  The County investigator told them that "[t]here's cameras in our pods, this is the booking area"; the "pods are different from the booking area"; and "there aren't cameras in any cell in the pods even, just in the common area."  Ex. 41 at 3.  The County investigator further explained that he was not aware of any cameras covering the area in question, but would "double[]check."  Ex. 41 at 4.  The County investigator reiterated, "But I am positive that I would have that footage had there been a camera in there."  Ex. 41 at 4.  The County investigator added, "I mean they've given me footage of everything, you saw how I have them step by step by step by every camera angle so they're not going leave that one out.  And I do know, that nowhere in any of our cells do we have cameras."  Ex. 41 at 4.

### D.  Pre-Litigation Events

In a letter dated June 17, 2020, Plaintiff's counsel sent the County a request under the Minnesota Government Data Practices Act ("MGDPA"), Minn. Stat. § 13.01 *et al.*, seeking, among other things, "[a]ny and all video surveillance [between 11:00 PM on January 2, 2020 through 4:00 AM on January 3, 2020], where [Joshua] Vogt is visible."  Ex. A at 1 to Decl. of Nicholas S. Sweeney, ECF No. 60-1.  Approximately 30 days later, the County's county attorney responded to Plaintiff's counsel, enclosing, among other things "5 [d]ifferent discs containing video from the [jail]."  Ex. B at 2 to Sweeney Decl.,

ECF No. 60-2. Included among the footage was video from the jail's Cameras 17 and 19, but not Camera 18. Pl.'s Mem. in Supp. at 8. Plaintiff's counsel followed up with the County, specifically requesting "[a]ll video footage from Camera 18." Ex. C at 1 to Sweeney Decl., ECF No. 60-3. Defense counsel responded on behalf of the County. *See generally* Ex. D to Sweeney Decl., ECF No. 60-4. After discussing the matter with the County, defense counsel stated that the County "confirmed the fact[] that . . . there is no video camera in the jail holding cell." Ex. D at 1 to Sweeney Decl.

Plaintiff subsequently filed this suit in April 2021. *See generally* ECF No. 1. Plaintiff noted in her pleading that there appeared to be missing video footage. *See, e.g.*, ECF No. 1 ¶¶ 18, 23, 25.

### E. Litigation

Throughout this litigation, Plaintiff continued to pursue what she believed to be the missing footage.

#### 1. Motion to Dismiss

The issue was discussed at the hearing on Defendants' prior motion to dismiss, at which another attorney with defense counsel's office explained that it was his understanding that "the video that the County offered to make available to [Plaintiff's counsel] was all of the video that they had in their possession from the time period, and it was, in my understanding, stored." ECF No. 34 at 31:10-14; *see* ECF No. 34 at 27:21-29:23, 31:4-32:8.

The attorney explained that the County "had to change how the video was stored based on a new system they put in place," and the video would "just have to be done

through a different method," "accessed through a different manner."  ECF No. 34 at
31:15-19.  The attorney emphasized that he did not believe video had been deleted.  ECF
No. 34 at 31:17-18 ("I really don't believe it was deleted."), 24-25 ("I just want to make
that clear.  I really don't believe it was deleted.").

Following the motion hearing, Plaintiff's counsel followed up with the County,
again requesting, among other things, "[a]ll video footage from Camera 18."  Ex. G at 1
to Sweeney Decl., ECF No. 60-7.  In response, defense counsel provided a link to
"responsive information reproduced to you again, including the video," noting that the
County has "produced the responsive data on multiple occasions" and "the repetitive
requests should come to an end."  Ex. H at 1 to Sweeney Decl., ECF No. 60-8.

### 2.  Written Discovery

In written discovery, Plaintiff requested that "all surveillance cameras that cover
the holding cell that [Joshua Vogt] was in when he died" be identified.  Ex. I at 9 to
Sweeney Decl., ECF No. 60-9.  Cameras 17 and 19 were identified.  Ex. I at 9 to Sweeny
Decl.  Similarly, Plaintiff requested "[a]ll video, photographic, or audio depictions of
Joshua Vogt at the [jail] in January 2020," and was told, in relevant part, "[n]one other
than the . . . [jail] video surveillance data previously provided to Plaintiff."  Ex. J at 3 to
Sweeney Decl., ECF No. 60-10.

### 3.  Depositions

#### a.    Defendant CO Imgrund

Defendant CO Imgrund's deposition was taken in this matter.  *See generally* Ex.
B.  During his deposition, Defendant CO Imgrund identified himself as "[l]ieutenant of

jail operations," Ex. B at 6:4-7, and testified that he was in charge of the jail at the time Joshua Vogt came in, Ex. B at 59:9-13.   During Defendant CO Imgrund's deposition, footage from Cameras 17 and 19 was played.   *See, e.g.*, Ex. B at 75:20-23, 108:9-11.

Defendant CO Imgrund testified that Camera 19 faced the "jail booking area" and, at 12:11 AM, Camera 19 showed Joshua Vogt "at the top of the screen," having changed into "jail-issued clothing."   Ex. B at 76:2-14.   When Joshua Vogt went "off the screen to the left," Defendant CO Imgrund testified that "[h]e went into group holding."   Ex. B at 76:15-19.   Defendant CO Imgrund was asked if there was "any camera that allows you to look into group holding."   Ex. B at 80:21-22.   Defendant CO Imgrund testified that he believed one camera had "a partial view of group holding," describing it as "a view of the door, but if the door is open, you can see what's in there" and adding that "the room is mostly glass."   Ex. B at 80:21-81:11.   Defendant CO Imgrund also testified that what could be seen also "depend[ed] on where [people] were sitting in group holding."   Ex. B at 98:16-99:2.   Continuing to watch Camera 19, Defendant CO Imgrund testified that it appeared Joshua Vogt "stumbled on his shoes" shortly after 12:30 AM while having his booking photos taken, over to or near "group holding."   Ex. B at 92:8-94:11.

Defendant CO Imgrund testified that, approximately 10 minutes later, he went into "group holding" and talked to Joshua Vogt.   Ex. B at 99:10-19.   Defendant CO Imgrund testified that Joshua Vogt was "shaking and sweating."   Ex. B at 99:20-22.   He further testified that he asked whether Joshua Vogt had taken any drugs and Joshua Vogt said no. Ex. B at 99:21-23.   Defendant CO Imgrund testified that Joshua Vogt told him he was having an anxiety attack and such attacks had happened before.   Ex. B at 99:24-100:7.

Defendant CO Imgrund testified that he asked Joshua Vogt to "take some deep breaths" and, after "a number of deep breaths," "the shaking immediately stopped." Ex. B at 100:8-11. Defendant CO Imgrund testified that, although Joshua Vogt continued to shake, the shaking would stop when he performed deep breathing. Ex. B at 100:12-19. Defendant CO Imgrund was with Joshua Vogt in "group holding" for approximately two minutes. Ex. B at 105:8-14. A few minutes later, Defendant COs Imgrund and Anderson returned to take Joshua Vogt over to "Court Holding 2." Ex. B at 107:2-108:7; *see* Ex. B at 109:18-112:11.

With Camera 17, Defendant CO Imgrund testified that this camera captures "a shot of the second door to group holding and the exit door . . . to the jail and the booking desk." Ex. B at 108:14-19. When asked if Camera 17 was the other camera he was talking about earlier that could "see inside group holding," Defendant CO Imgrund testified that it was not "the one [he] was thinking of." Ex. B at 108:20-24. Defendant CO Imgrund testified that Joshua Vogt appeared "[s]haky and unsteady" as he and Defendant CO Anderson transported him from "group holding" to "Court Holding 2." Ex. B at 109:15-111:3.

When they reached approximately 1:30 AM on Camera 17 during the deposition, Defendant CO Imgrund asked if this is where Joshua Vogt "raised his hand." Ex. B at 116:10-17. Plaintiff's counsel responded that he did not "have any video showing whether or not [Joshua Vogt] raised his hand." Ex. B at 116:18-20. Defendant CO Imgrund testified that he believed Joshua Vogt "raised his hand" and then Defendant CO Imgrund "asked him if he was okay." Ex. B at 117:5-9. Defendant CO Imgrund

testified, at this point, Joshua Vogt was no longer speaking clearly and Defendant CO

Imgrund directed that emergency medical services be called.  Ex. B at 117:5-19.

The following exchange occurred with respect to possible footage of "group

holding" and "Court Holding 2":

> Q.    Okay.  Do you know, is there a camera that shows into Court Holding 2?
>
> A.    Not inside it.
>
> Q.    What about outside enough that you could see inside the window?
>
> A.    Not that you can see inside the window, no.
>
> Q.    Okay.  Is there a better view of the front of Court Holding 2 than this camera angle that I'm using right now?
>
> A.    Yes, there is.
>
> Q.    Okay.  Any idea what that camera number is, top of your head?
>
> A.    [18].
>
> Q.    [18]?  Doesn't look like I've got that one.  Have you seen Camera Angle 18—well, first, prior to coming here today, had you reviewed these videos?
>
> A.    Some parts of them, yes.
>
> Q.    Had you reviewed Camera—had you seen Camera 18 on this?
>
> A.    On these videos, I did not see it.
>
> Q.    Okay.  All right.  We'll talk more about the cameras a little later.  And that camera that

11

> showed into group holding that we had kind of talked about, that I asked questions about, where you could see part of group holding, what camera is that?
>
> A.    I don't—I don't know the number.  I don't think it's 18.  But it—it could be.
>
> Q.    Okay.
>
> A.    I—I think it—I think the other angle is in here.

Ex. B at 119:4-120:14.

When looking at a schematic of the jail, Defendant CO Imgrund testified that Camera 18 would show "the booking desk and towards the exit door" as well as "Court Holding 2."  Ex. B at 150:10-21, 153:9-19.  Defendant CO Imgrund also examined the jail's "DVR chart," which consisted of "a list of cameras and what [digital video recorders] they're saved to."  Ex. B at 155:18-156:4.  This chart showed that Cameras 17, 18, and 19 were all identified as "Booking" cameras.  Ex. 49 at 1, ECF No. 53-6.  Defendant CO Imgrund agreed that Camera 18 was identified as "Booking 2."  Ex. B at 156:11-14; *see* Ex. 49 at 1.

Defendant CO Imgrund was not in charge of saving the video from the night in question and burning it onto discs.  Ex. B at 145:4-19; 158:5-159:6.

**b.    County's 30(b)(6) Deposition**

Heath Fosteson was the designee for the County's 30(b)(6) deposition.  *See* Pl.'s Mem. in Supp. at 14.  Fosteson is the captain of the jail and the jail's administrator.  Ex. A at 8:12-17, 9:6-9, ECF No. 53-1.  In his role as jail administrator, Fosteson is responsible for investigating major incidents at the jail, such as an in-custody death,

"collect[ing] all the information," and "submit[ting] it to the Department of Corrections."

Ex. A at 11:21-12:11, 20:3-24, 21:11-24.

Fosteson described the procedure following an in-custody death:

> Well, from the moment that I'm notified that there has been an incident in the jail, we would initiate an investigation; which would mean investigators are called, either from our sheriff's office or from an outside agency if it need be.
>
> Those investigators would respond right away to the jail and take over the scene and begin their investigation.
>
> So that would be documenting the area of the incident, taking statements from officers, taking photographs. Just basically documenting the scene.
>
> My responsibilities as far as the Department of Corrections are concerned, I have ten days to gather up the information related to the incident.
>
> Within the first 24 hours, I have to notify the Department of Corrections that there was an incident, what the nature was, who was involved, et cetera.
>
> Within those ten days, I have to submit officer reports, any videos, logs, autopsy, general information that's required by the Department of Corrections.

Ex. A at 12:18-14:1.

As for what took place following Joshua Vogt's death, Fosteson testified that "County investigators came on the scene immediately after the incident," while emergency services "was still there working o[n Joshua] Vogt." Ex A at 18:11-24. Fosteson testified that "[o]ne of our sergeants recorded the videos and gave them to me," which he then forwarded along to the County's county attorney and the Department of Corrections. Ex. A at 21:16-24; *see* Ex. A at 48:19-49:2. Fosteson did not recall which sergeant recorded the videos in this case. Ex. A at 21:25-22:2.

A Department of Corrections inspector came to meet with Fosteson after having received all of the information gathered up and sent to the Department by Fosteson.  Ex. A at 20:21-21:3.    Fosteson testified that the Department of Corrections inspector "watched all the video with [him] in person, in [Fosteson's] office."  Ex. A at 21:4-5.

Fosteson testified that Camera 18 is "one of the cameras in the booking area."  Ex. A at 27:21-23; *see also* Ex. A at 31:2-6 ("Camera 18 shoots toward the exit door from the booking area to the court hallway.").    Fosteson testified that Camera 18 would depict "Court Holding 2" and possibly a portion of "group holding."  Ex. A at 31:7-23, 35:2-22. Fosteson agreed that Camera 18 would show Joshua Vogt being transported from "group holding" to "Court Holding 2" by Defendant COs Imgrund and Anderson.  Ex. A at 36:4-13.  Fosteson also testified that the wall of "Court Holding 2" has a "partition," meaning "the lower portion of the wall, it's a closed-off wall, you can't see through" whereas the upper portion of the wall is "glass" that "you can see through."    Ex. A at 49:8-18. Fosteson testified that if a person were laying down in "Court Holding 2," they would not be visible by Camera 18.  Ex. A at 49:19-21.

Fosteson testified that he did not believe footage from Camera 18 had been provided to Plaintiff or her counsel.  Ex. A at 28:24-29:2.  Fosteson believed Cameras "17 and 19 were the two angles that we had there from the booking room."  Ex. A at 29:2-4.    Fosteson further testified that Camera 18 was not provided to the County's county attorney, nor was it viewed by County investigators.  Ex. A at 29:5-8, 30:2-6. And, while Camera 18 was not provided to the Department of Corrections, Fosteson testified that the Department of Corrections inspector reviewed footage from Camera 18

when he came to meet with Fosteson.  Ex. A 29:9-13, 30:7-9; *see* Ex. A at 48:4-8.
Fosteson testified that the Department of Corrections inspector came "within a month of"
Joshua Vogt's death.  Ex. A at 48:9-18.

Fosteson was asked whether he still had a copy of the footage from Camera 18.
Fosteson testified that he did not and they "did not record it for some reason."  Ex. A at
30:10-12, 18-19; *see also* Ex. A at 32:8-11 (Q.  "Even though [Joshua Vogt] was there in
that cell, Court Holding 2, that footage was not saved?"  A.  "No, it was not.").  When
asked why the footage from Camera 18 was not recorded, Fosteson theorized: "I—when
the sergeants recorded the videos, I think the two angles that they had were the ones that
they—they thought they needed to record, that depicted that area where [Joshua Vogt]
was."  Ex. A at 30:20-31:1.  Fosteson testified that, by the time Plaintiff's MGDPA
request came, the footage from Camera 18 "would have been recorded over already"
because of "how busy those cameras are" and the system "overwrites itself when it gets
to capacity."  Ex. A at 39:4-12, 40:6-14.  Fosteson estimated that the footage from
Camera 18 would have been overwritten by the end of March 2020 and could have been
overwritten as soon as the end of February 2020.  Ex. A at 47:13-21.  Fosteson
additionally testified that the jail got a "new camera system" and the system being used
when Joshua Vogt died "is no longer in place in the jail" and had "been removed."  Ex. A
at 30:13-17; *see* Ex. A at 40:2-5 (system switch between August and November 2020).

### III. ANALYSIS

There is no dispute that the footage from Camera 18 is no longer available.  Defs.'
Mem. in Opp'n to Punitive Damages at 9 n.5 ("Camera 18 footage is not available having

been overwritten within 30-60 days of the incident."). Pursuant to Rule 37(e) of the Federal Rules of Civil Procedure, Plaintiff seeks sanctions for the failure to preserve the footage from Camera 18. The CO Defendants oppose the motion.[4]

### A. Legal Standard

The Federal Rules of Civil Procedure require that parties take reasonable steps to preserve electronically stored information that is relevant to litigation. Fed. R. Civ. P. 37(e). The Court may sanction a party for failure to do so, provided that the lost information cannot be restored or replaced through additional discovery. *Id*. Rule 37(e) makes two types of sanctions available to the Court. Under Rule 37(e)(1), if the adverse party has suffered prejudice from the spoliation of evidence, the Court may order whatever sanctions are necessary to cure the prejudice. But under Rule 37(e)(2), if the Court finds that the party "acted with the intent to deprive another party of the information's use in the litigation," the Court may order more severe sanctions, including, among other things, a presumption that the lost information was unfavorable to the party, an instruction to the jury that it "may or must presume the information was unfavorable to the party," or entry of default judgement. "Federal courts also have inherent authority to impose sanctions against a party when that party destroys evidence that it knew or should have known is relevant to potential litigation and, in doing so,

---

[4] The CO Defendants' response to Plaintiff's motion was due within 7 days. D. Minn. LR 7.1(b)(2). The response was filed more than six weeks later. *See generally* ECF No. 63. In their response, the CO Defendants incorporated by reference their response to Plaintiff's "motion for leave to amend the complaint to add a claim for punitive damages," wherein "Plaintiff first referenced the claimed spoliation." ECF No. 57 at 1; *see* ECF No. 49 at 3. Local Rule 7.1(g) sets forth a number of options the Court may take when "a party fails to timely file and serve a memorandum of law," including "tak[ing] any other action that the [C]ourt considers appropriate." Because the CO Defendants' untimely memorandum does not raise any new arguments not previously articulated in their prior memorandum, the Court has, in its discretion, considered their opposition.

prejudices the opposing party." *Kelley ex rel. BMO Litig. Trust v. BMO Harris Bank, N.A.*, Case Nos. 19-cv-1756 (WMW), 19-cv-1869 (WMW), ___ B.R. ____, 2022 WL 2801180, at *4 (D. Minn. July 18, 2022) (citing *Dillion v. Nissam Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993)); *see also, e.g.*, *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004); *E*Trade Secs. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 586 (D. Minn. 2005).

### B. County's Obligation to Preserve & Failure to Take Reasonable Steps

A party is obligated to preserve evidence once the party knows or should know that the evidence is relevant to future or current litigation. *E*Trade Secs.*, 230 F.R.D. at 588; *see also* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment (preservation of evidence required when litigation is reasonably foreseeable). "A variety of events may alert a party to the prospect of litigation." Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. "The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence." *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 740 (N.D. Ala. 2017).

The Court concludes that the County had a duty to preserve the footage from Camera 18 immediately following Joshua Vogt's death. The County was in control of all of the video footage from its jail regarding the events in question. Fosteson testified as to the importance of documenting what took place following a major incident at the jail, such as an in-custody death, not only for the County's own investigation but also for submission to the Department of Corrections. *See LaJocies v. City of North Las Vegas*, No. 2:08-cv-00606-GMN-GWF, 2011 WL 1630331, at *2 (D. Nev. Apr. 28, 2011)

("Defendants' own protocols provide procedures for the preservation of such evidence."). Fosteson testified that he had ten days in which to gather up all of the information regarding Joshua Vogt's death, including videos, and submit it for review. There is no dispute that Camera 18 would have captured at least a partial view of the "Court Holding 2" cell where Joshua Vogt was for 45 minutes before his condition deteriorated to the point that Defendant CO Imgrund called for emergency medical services. *See, e.g.*, Defs.' Mem. in Opp'n to Punitive Damages at 18 ("That footage would have captured some of court holding and group holding from angles different than the camera angles in the record."); *see also* Ex. 50 at 1, ECF No. 53-6. Additionally, the County was not an unsophisticated party. *Blazer v. Gall*, No. 1:16-cv-01046-KES, 2019 WL 3494785, at *4 (D. S.D. Aug. 1, 2019); *see also* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment (taking into account "party's sophistication with regard to litigation in evaluating preservation efforts"); *cf. Taylor v. Null*, No. 4:17-CV-0231-SPM, 2019 WL 4673426, at *6 (E.D. Mo. Sept. 25, 2019) ("Defendants had general knowledge that the security footage of the alleged excessive use of force against Plaintiff would be important to any litigation that would potentially ensue."). Further, the very day of Joshua Vogt's death, members of his family met with the County, expressed interest in watching the video footage, and repeatedly made reference to speaking with an attorney over what had occurred.

The Court similarly concludes that the County failed to take reasonable steps to preserve the footage from Camera 18. Notably, the County preserved footage from Cameras 17 and 19 but not Camera 18, which, like Cameras 17 and 19, was also

described as a "booking"-area camera.  Ex. 49 at 1.  *See Estate of Hill ex rel. Grube v. NaphCare, Inc.*, No. 2:20-cv-00410-MKD, 2022 WL 1464830, at *11 (E.D. Wash. May 9, 2022) ("Notably, portions of the 2W27 hallway video were preserved, demonstrating that reasonable measures were available and were taken to preserve these portions. Plaintiffs have established that the missing portion of the 2W27 video is lost because Spokane County failed to take reasonable steps to preserve it.").  Fosteson did not know why the footage from Camera 18 was not preserved.  Moreover, Fosteson was the person *both* in charge of gathering all of the video evidence and submitting it to the relevant authorities *and* the person who later met with the Department of Corrections inspector to watch the video.  Even if it could be said that the footage from Camera 18 was inadvertently not included in the materials Fosteson previously provided to the County's county attorney and the Department of Corrections,[5] the subsequent meeting with the Department of Corrections inspector in which Fosteson reviewed the footage from Camera 18 along with the inspector should have alerted him to the fact that there was additional footage available that he had not previously preserved and provided.  The Court is skeptical of the fact that the footage of Camera 18 was shared with the Department of Corrections, yet Fosteson could not explain why it had not been preserved along with the other footage.

---

[5] The Court appreciates that there was likely a significant amount of footage involved in this investigation.  Indeed, at the hearing, the Court noted that Exhibits 18-A through 18-K, which contained video footage from the jail, had anywhere from a single video clip to more than 100 video clips in the individual exhibit.  The Court inquired as to whether it was technically possible to create a compilation of the video clips that the parties agreed reflected the events in question for the Court's review.  This was provided to the Court following the hearing.  *See generally* ECF No. 70-1.

### C. Intent

Spoliation is the "intentional destruction [of evidence] indicating a desire to suppress the truth." *Stevenson*, 354 F.3d at 746; *see Fair Isaac Corp. v. Fed. Ins. Co.*, No. 16-cv1054 (WMW/DTS), 2020 WL 9179259, at *3 (D. Minn. May 15, 2020); *see also Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) ("The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth . . . ."). "Mere negligence, a finding that a party knew or should have known not to destroy relevant evidence, is not enough." *Fair Isaac Corp.*, 2020 WL 9179259, at *3; *see Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018); *Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th Cir. 2004); *see also* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment (negligence and gross negligence not enough); *cf. Stepnes v. Ritschel*, 663 F.3d 952, 965 (8th Cir. 2011) ("Severe spoliation sanctions, such as an adverse inference instruction, are only appropriate upon a showing of bad faith."). "[T]here must be evidence of 'a serious and specific sort of culpability' regarding the loss of the relevant ESI." *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019) (quoting *Auer*, 896 F.3d at 858). Because "[i]ntent rarely is proved by direct evidence, . . . a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motivations of the witnesses in a particular case and other factors." *Morris*, 373 U.S. at 901; *accord Greyhound Lines*, 485 F.3d at 1035; *Kelley*, 2022 WL 2801180, at *6.

The CO Defendants characterize the County's failure to preserve the footage from Camera 18 as an "unfortunate" "mistake" by "jail administration."  Defs.' Mem. in Opp'n to Punitive Damages at 19.  The Court disagrees.  Under the circumstances of this case, the County's failure to preserve the footage from Camera 18 warrants a finding of bad faith.  First, the County, and Fosteson as the jail administrator, knew that video footage of the events surrounding a major jail incident like Joshua Vogt's in-custody death would be relevant to the ensuing investigation and any potential litigation arising therefrom.  *See Stevenson*, 354 F.3d at 748; *Taylor*, 2019 WL 4673426, at \*6.

Second, the County preserved footage from other camera angles generally covering this area of the jail, such as Cameras 17 and 19, but not Camera 18.  Based on the record before the Court, Camera 18 captured footage different from other cameras in the booking area and would have had a view into the "Court Holding 2" cell, where Joshua Vogt was leading up to and at the time of his death.  *See Stevenson*, 354 F.3d at 748; *Taylor*, 2019 WL 4673426, at \*6.  Courts have found the requisite intent to deprive based on selective preservation of evidence, whereby a litigant "allow[ed] some portions [of relevant evidence] to be overwritten by automatic procedures" "without a credible explanation."  *Estate of Hill*, 2022 WL 1464830, at \*12 (citing *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 774 (E.D. Mich. Jan. 10, 2019)); *see Stevenson*, 354 F.3d at 748.  No explanation—credible or otherwise—has been offered for why the footage from Camera 18 was available for Fosteson to review with the Department of Corrections inspector but not preserved with the other footage.  *See Estate of Hill*, 2022 WL 1464830, at \*12 ("The absence of any explanation for preserving less relevant video

21

while permitting the destruction of the most relevant video is notable given Lieutenant Hooper's testimony that Spokane County Detention Services' standard operating procedure would have been to preserve the video related to Ms. Hill's confinement from the day of her death.").

Third, this was not a "passive failure" by the County. *See Estate of Bosco ex rel. Kozar v. Cty. of Sonoma*, No. 20-cv-04859-CRB, ___ F. Supp. 3d ____, 2022 WL 16927796, at *10 (N.D. Cal. Nov. 14, 2022). Fosteson was aware of the footage from Camera 18 because he viewed it with the Department of Corrections inspector as part of the follow-up investigation into Joshua Vogt's death. *See id.* ("But here, more than a failure to halt an automatic deletion process is at issue: Defendants undertook a criminal investigation of Bosco's death that included a thorough review of the video in question while the automatic deletion process could still be halted."); *contra Auer*, 896 F.3d at 858; *Stepnes*, 663 F.3d at 965. Fosteson, and thus the County, was therefore on notice of the existence of the Camera 18 footage at a time when it could be saved.

In sum, the Court finds it reasonable to infer that, under this combination of circumstances, the act of allowing the footage from Camera 18 to be overwritten "creates a sufficiently strong inference of an intent to destroy it for the purpose of suppressing evidence of the facts surrounding" Joshua Vogt's death at the jail. *Stevenson*, 354 F.3d at 748; *accord Taylor*, 2019 WL 4673426, at *6; *see also Estate of Hill*, 2022 WL 1464830, at *13; *Culhane*, 364 F.3d at 774.

### D. Prejudice to Plaintiff[6]

Prejudice exists when spoliation prohibits a party from presenting evidence that is relevant to its underlying case. Prejudice can also be established "by the nature of the evidence destroyed." *Stevenson*, 354 F.3d at 748. In *Stevenson*, the Eighth Circuit Court of Appeals found that "[t]he requisite element of prejudice" had been satisfied when the evidence destroyed was "the only contemporaneous recording of conversations at the time of the accident" at a train crossing. *Id.* "While there [wa]s no indication that the voice tape destroyed contained evidence that could be classified as a smoking-gun, the very fact that it [wa]s the only recording of conversations between the engineer and dispatch contemporaneous with the accident render[ed] its loss prejudicial to the plaintiffs." *Id.*

Plaintiff asserts that her "case centers on the inference that Joshua Vogt's condition would have been severe, unrelenting, worsening, and obvious, and that [the CO Defendants] deliberately disregarded [his] deteriorating condition until it was too late." Pl.'s Mem. in Supp. at 25; *see Vogt v. Crow Wing Cty.*, No. 21-cv-1055 (WMW/KMM), 2021 WL 6275271, at *5 (D. Minn. Nov. 1, 2021) ("While he had not been diagnosed by

---

[6] In connection with the 2015 amendments to Rule 37(e), the advisory committee noted:

> Subdivision (e)(2) does not include a requirement that the court find prejudice to the party deprived of the information. This is because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position. Subdivision (e)(2) does not require any further finding of prejudice.

The Court has made the requisite finding of intent. *See supra* Section III.C. Nevertheless, the parties have each addressed the issue of prejudice and the Court finds it prudent to do so as well. *See, e.g.*, Pl.'s Mem. in Supp. at 25-26; Defs.' Mem. in Opp'n to Punitive Damages at 20.

a physician, these symptoms and behaviors would suggest to even a layperson that [Joshua] Vogt was undergoing a medical emergency and in need of immediate attention—especially given how rapidly they set on and worsened."), *report and recommendation adopted*, No. 21-cv-1055 (WMW/TNL), 2022 WL 37512 (D. Minn. Jan. 4, 2022). Plaintiff asserts that the footage from Camera 18 "would have been the best evidence" that the CO Defendants were aware of Joshua Vogt's serious medical needs and deliberately disregarded them. Pl.'s Mem. in Supp. at 25. Plaintiff asserts that "[t]here is no substitute for the visual impact of video." Pl.'s Mem. in Supp. at 26.

The CO Defendants counter that "[t]he contents of Camera 18 would be of little value to Plaintiff." Defs.' Mem. in Opp'n to Punitive Damages at 20. According to the CO Defendants, "Camera 18 would not have captured [Joshua Vogt] during any moments where at least two other angles of footage did not also cover him." Defs.' Mem. in Opp'n to Punitive Damages at 20. In light of both Defendant CO Imgrund and Fosteson's deposition testimony that Camera 18 would have at least a partial view of the "Court Holding 2" cell, this does not appear to be the case. *See also* Defs.' Mem. in Opp'n to Punitive Damages at 18 ("That footage [from Camera 18] would have captured some of court holding and group holding from angles *different* than the camera angles in the record." (emphasis added)). At the hearing, defense counsel also acknowledged that Camera 18 would have captured the cell where Joshua Vogt died. Moreover, "one party to a lawsuit does not 'possess the unilateral ability to dictate the scope of discovery based on their own view of the parties' respective theories of the case.'" *Kelley*, 2022 WL

2801180, at *11 (quoting *Sentis Grp., Inc. v. Shell Oil Co.*, 763 F.3d 919, 925 (8th Cir. 2014)).

As stated above, destroyed evidence need not amount to the proverbial smoking gun before its loss can be deemed prejudicial. *See Stevenson*, 354 F.3d at 748; *accord Kelley*, 2022 WL 2801180, at *10. Camera 18 "would have captured another perspective of the incident in question." *Culhane*, 364 F. Supp. 3d at 775; *see LaJocies*, 2011 WL 160331, at *2 ("Despite the limited viewing angle of the videotape which may have captured only the threshold of the door but not inside the cell, it is likely that it did still capture at least some of the altercation (whether sights or sounds) and could have potentially assisted the jury to understand the tenor of the event and to evaluate the credibility of the witnesses who are providing conflicting descriptions."); *see also Woods v. Scissons*, No. CV-17-08038-PCT-GMS, 2019 WL 3816727, at *3 (D. Ariz. Aug. 14, 2019) ("Even if the exact angle was not perfect such that the recordings did not actually capture images of the incident, it is enough that the cameras may have captured any footage of the incident."); *cf. Kelley*, 2022 WL 2801180, at *11 ("Even if the spoliated evidence is cumulative to some extent, the availability of the same or similar evidence from third parties or other sources does not necessarily demonstrate a lack of prejudice.").

Neither the Court nor Plaintiff can know what the footage from Camera 18 showed or how significant that footage was to this litigation. "[I]t is impossible to determine precisely what the destroyed [footage] contained or how severely the unavailability of [this footage] prejudiced [Plaintiff's] ability to prove [her] claim[]."

*Paisley Park Enters.*, 330 F.R.D. at 236 (quotation omitted); *see Kelley*, 2022 WL 2801180, at *10. The footage may have given the viewer an idea of what was visible during the well-being checks conducted on Joshua Vogt and any deterioration (or lack thereof) in his condition. *See* Defs.' Mem. in Opp'n to Punitive Damages at 5-6; *see also* Minn. R. 2911.5000, subp. 5 ("A written policy and procedure shall provide that all inmates are personally observed by a custody staff person at least once every 30 minutes."); *cf. Estate of Hill*, 2022 WL 1464830, at *14. Indeed, in the video compilation provided to the Court, jail staff can be seen peering into "Court Holding 2" to check on Joshua Vogt regularly—at least seven times—in the approximately 45 minutes between when he was placed in "Court Holding 2" and when Defendant CO Imgrund entered around 1:30 a.m. to speak with him. *See* ECF No. 70-1 at 8:30-9:58. It is also possible that the footage from Camera 18 would have showed Joshua Vogt raising his hand and the nature of that gesture, which is what prompted Defendant CO Imgrund to go into "Court Holding 2" and ask if he was okay.

The sad circumstances of this lawsuit mean that Joshua Vogt is not available to testify as to any symptoms he was exhibiting or interactions he had with the CO Defendants on the night in question. While other camera angles, including Cameras 17 and 19 are available to Plaintiff, Camera 18 is the only one capturing at least a partial view of "Court Holding 2," where Joshua Vogt was being held at the time of his death. The Court concludes that "there is a reasonable probability that the loss of . . . [Camera 18's footage] has materially prejudiced [Plaintiff] in [her] case against [the CO Defendants]." *E*Trade Secs.*, 230 F.R.D. at 592; *see Kelley*, 2022 WL 2801180, at *10.

### E. Imputed to the CO Defendants

There appears to be no real dispute that the CO Defendants themselves were not involved in the preservation of the video footage of the night in question.  It was the County, through Fosteson, the jail administrator, who was ultimately responsible for gathering and preserving the footage.

Recognizing that it was the County's duty to preserve the footage from Camera 18, Plaintiff has moved for reinstatement of the County.  Plaintiff asserts that the County failed to comply with Minnesota law by not turning over the footage from Camera 18 to the county attorney or the Department of Corrections, citing Minn. R. 2911.3700, subp. 4.  But, even assuming for sake of argument that this were true, "Minnesota courts do not recognize an independent tort for spoliation of evidence." *Horde v. Elliot*, No. 17-cv-800 (WMW/SER), 2018 WL 987683, at *11 (D. Minn. Jan. 9, 2018) (citing cases), *report and recommendation adopted*, 2018 WL 985294 (D. Minn. Feb. 20, 2018); *see also, e.g.*, *Berget v. City of Eagan*, No. 08-cv-4728 (MJD/FLN), 2010 WL 11602636, at *9 (D. Minn. Mar. 23, 2010) ("Neither Minnesota nor the Eighth Circuit, however, recognizes an independent tort for spoliation of evidence."); *Ansari v. NCS Pearson, Inc.*, No. 08-cv-5351 (JRT/JJG), 2009 WL 10678873, at *2 (D. Minn. Mar. 30, 2009) ("Minnesota law provides no civil claim for negligent or intentional spoliation of evidence."), *objections overruled*, 2009 WL 2337137 (D. Minn. July 23, 2009).  Additionally, the Eighth Circuit has explained that "a spoliation ruling is evidentiary in nature and federal courts generally apply their own evidentiary rules in both federal question and diversity matters." *Sherman v. Rinchem Co.*, 687 F.3d 996, 1006 (8th Cir. 2012) (quoting *Adkins*

*v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)); *cf., e.g., Turner v. United States*, 736 F.3d 274, 282 n.5 (4th Cir. 2013) ("Spoliation of evidence, standing alone, does not constitute a basis for a civil action under either federal or admiralty law."); *Johns v. Gwinn*, 503 F. Supp. 3d 452, 465 (W.D. Va. 2020) ("[T]here is no standalone cause of action for destruction of evidence.").

The CO Defendants maintain that, because none of them "had any control over the storage of the camera footage," they should not be sanctioned.  Defs.' Mem. in Opp'n to Punitive Damages at 19.  In *Burris v. Gulf Underwriters Insurance Co.*, the Eighth Circuit considered an adverse-inference instruction against an insurer arising out of conduct by its insured.  787 F.3d 875, 879-880 (8th Cir. 2015).  The alleged spoliation at issue related to a letter purportedly sent by the plaintiff's attorney to the insured in 2003, which would have triggered coverage under the insurance policy.  *Id.* at 877.  The insurer denied that its insured ever received the letter.  *Id.*  Whether the letter was received within the coverage period was a question of fact for the jury.  *Id.* at 878.  The plaintiff requested an adverse-inference instruction against the insurer on the basis that its insured spoliated evidence by destroying more than 30 boxes of records from a third-party claims handler a year prior to the litigation, boxes which the plaintiff argued may have contained the letter.  *Id.* at 877, 879.  The request was denied.  *Id.* at 878.

The plaintiff appealed, "arug[ing] that the district court erred in declining to issue the spoliation instruction."  *Id.*  The Eighth Circuit held that the evidence was insufficient to establish that the insured "destroyed the boxes to suppress the truth regarding [the plaintiff's] claim."  *Id.* at 879.  The evidence did not show that the insured knew the letter

was in the boxes or suggest that the insured "destroyed the boxes because [it] knew litigation would be forthcoming." *Id.* Additionally, the insured testified that it was no longer using that third-party claims handler at the time the letter was purportedly sent and therefore the letter would not have been in the boxes. *Id.*

> The Eighth Circuit further stated that

>> even if [the plaintiff] had presented evidence that [the insured] intentionally destroyed the files to suppress the truth, and that this destruction prejudiced [the plaintiff], an adverse instruction would not be warranted against [the insurer] because [the insurer] had no involvement in the alleged spoliation of the documents, nor any access, or control, over the destroyed files.

*Id.* at 880. The Eighth Circuit explained that

>> [s]ince the imposition of an adverse inference instruction for spoliation is a kind of sanction meant, in part, to shift the burden to the spoliating party to prove the destroyed evidence was not favorable to them, it defies the purpose of the sanction to impose it on a party that played no part in the alleged spoliation of evidence.

*Id.* (citation omitted). An analogy could arguably be made between the CO Defendants in this case and the insurer in *Burris*.

Because they were not responsible for preserving the footage from Camera 18, the CO Defendants maintain that they should not be held accountable for the County's failure to preserve it. Essentially, the CO Defendants "would have the Court conclude that Plaintiff has no remedy." *Taylor*, 2019 WL 4673426, at *5. Such an argument was rejected by a federal district court in this Circuit in *Taylor*. *Taylor* involved an inmate's claim of excessive force against corrections officers at a state-run facility. *Id.* at *1, 3.

The facility's response to a grievance sent by the inmate "reveal[ed] that video records existed of the areas in which the incidents allegedly occurred and for the timeframe in which they happened." *Id.* at *3. "However, while evidence indicate[d] that such footage did exist," the footage was apparently destroyed "in accordance with a routine retention policy, whereby the Missouri Department of Corrections' recording system writes-over such footage if it is not affirmatively preserved." *Id.* at *3. The inmate sought sanctions for spoliation, arguing that the defendants "should have been aware that litigation related to [his] complaints of unauthorized use of force was likely, and that the footage should have been preserved, as [he] filed several timely complaints about the alleged abuse, and affirmatively requested the video footage on more than one occasion." *Id.*

The defendants cited *Burris* "to support their contention that the Court may not impute the destruction of evidence to parties who did not personally cause the alleged spoliation." *Id.* at *5. The district court in *Taylor*, however, concluded that "*Burris* [wa]s distinguishable from the case at hand in two salient ways." *Id.* First, the relationship between the alleged spoliator and the recipient of the sanctions was different. *Id.* The defendant corrections officers were employees of the state department of corrections, which "had ultimate control of the video evidence." *Id.* Second, whereas the insurer in *Burris* "had no control over the evidence, and did not participate in the spoliation in even a tangential manner," the evidence before the district court showed that the defendant corrections officers in *Taylor* "had the ability to preserve the video by requesting its preservation," even though they "did not personally maintain or control the

security video footage at [the facility]." *Id.*  The district court pointed out that, according to state department of corrections' policy, "only employees of [the facility] could have undertaken to preserve the video, and facility employees, including [the defendant corrections officers], were aware that they must request the retrieval and preservation of video footage when they thought it necessary." *Id.*  Accordingly, the district court in *Taylor* found "reason to impute the spoliation to the [defendant corrections officers], as they were in a position to have the video footage preserved, had reason to foresee its importance to potential litigation, and yet failed to request its preservation." *Id.*

"Courts have imputed spoliation by the state or its agencies to named officer defendants in [§] 1983 actions." *Id.* (citing cases); *see also, e.g.*, *Stanbro v. Westchester Cty. Health Care Corp.*, Nos. 19 Civ. 10857 (KMK) (JCM), 20 Civ. 1591 (KMK) (JCM), 2021 WL 3863396, at *5-9 (S.D. N.Y. Aug. 27, 2021); *Johns*, 503 F. Supp. 3d at 462-65; *Mizzoni v. Nevada*, No. 3:15-cv-00499-MMD-WGC, 2017 WL 4284597, at *6 (D. Nev. Sept. 27, 2017), *report and recommendation adopted*, 2018 WL 485873 (D. Nev. Jan. 19, 2018); *Muhammad v. Mathena*, No. 7:14cv00529, 2016 WL 8116155, at *7-8 (W.D. Va. Dec. 12, 2016), *report and recommendation adopted*, 2017 WL 395225 (W.D. Va. Jan. 27, 2017); *Pettit v. Smith*, 45 F. Supp. 3d 1099, 1105-06, 1108-11 (D. Ariz. 2014); *cf. Woods*, 2019 WL 3816727, at *4 (imputing spoliation by police department to city).

In doing so, these courts have focused on the fact that, while the defendant officer-employees were not individually responsible for the evidence at issue, their employing state-agency corrections departments did control the evidence and who had access to it. *Pettit*, 45 F. Supp. 3d at 1106; *see also, e.g.*, *Stanbro*, 2021 WL 3863396, at *6; *Johns*,

503 F. Supp. 3d at 463; *Mizzoni*, 2017 WL 4284597, at *6; *Muhammad*, 2016 WL 8116155, at *8; *cf. Woods*, 2019 WL 3816727, at *4. The defense of the defendant officer-employees was also funded by the state and they would be indemnified from liability based on acts and omissions occurring within the scope of their employment. *Pettit*, 45 F. Supp. 3d at 1106; *see also, e.g.*, *Stanbro*, 2021 WL 3863396, at *6; *Johns*, 503 F. Supp. 3d at 463; *Muhammad*, 2016 WL 8116155, at *8; *cf. Woods*, 2019 WL 3816727, at *4. As a result, the state agency was not "merely a disinterested third party with no duty to preserve evidence." *Pettit*, 45 F. Supp. 3d at 1106; *see Johns*, 503 F. Supp. 3d at 463 ("Any sanction against [the defendant corrections officer] will be in many important respects a sanction felt most acutely by the [state department of corrections]."); *see also, e.g.*, *Stanbro*, 2021 WL 3863396, at *6; *Mizzoni*, 2017 WL 4284597, at *6.

"In all practical respects, [the state agency] [was] in the same position as parties on whom courts routinely impose a duty to preserve—it [wa]s an agency of the [s]tate that funds the defense and pays any judgment, its employees are subject to suit for their actions while in its employ, and it has sole custody and control over most of the relevant evidence." *Pettit*, 45 F. Supp. 3d at 1106; *see also, e.g.*, *Stanbro*, 2021 WL 3863396, at *6; *cf. Woods*, 2019 WL 3816727, at *4. These "special circumstances" warranted imputation of the state agency's failure to preserve to the individual defendant officer-employees. *See Pettit*, 45 F. Supp. 3d at 1106, 1110; *see also, e.g.*, *Stanbro*, 2021 WL 3863396, at *6 (noting "unique relationship between [state department of corrections] and its correctional officers in the context of spoliated evidence"); *Johns*, 503 F. Supp. 3d

at 463 (state department of corrections "has a uniquely intertwined relationship" with defendant corrections-officer employees).

A contrary result, one court cautioned, "would present a dilemma in the context of prison litigation . . . where the responsibility for preserving evidence may be spread out among multiple officials within an institution." *Muhammad*, 2016 WL 8116155, at *7 (footnote omitted). Another noted that "refusal to recognize a special relationship would lead to the absurd result that a state-run correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits," and "would encourage barriers to accountability for failure to preserve material evidence and undermine the integrity of the judicial process that depends on the adversarial presentation of evidence in order to uncover the truth." *Johns*, 503 F. Supp. 3d at 464-65 (quotation omitted).

This logic is equally applicable to the County and the CO Defendants. The County had sole custody and control over the footage from Camera 18. The CO Defendants are in a similar special relationship with the County based on their employment. The CO Defendants are represented by the same counsel as the County. *See generally* Ex. D to Sweeney Decl. The County has similar indemnification responsibilities. *See, e.g.*, Minn. Stat. §§ 466.02, .07. And, comparable concerns exist with respect to the preservation of evidence in the context of alleged violations of constitutional rights in county-run jails and corrections facilities. Therefore, while the County will not be "reinstated," the Court concludes that the County's failure to preserve

the footage from Camera 18 is properly imputed to the CO Defendants under the circumstances.

In doing so, the Court agrees with and echoes the words of the district court in *Stanbro*: "[C]ommon sense cautions against endorsing a bright line rue that [a state agency or county's] spoliation of evidence should always be imputed to correctional officers by virtue of the unique relationship between them."  2021 WL 3863396, at *7. "Imposing a rule to cover every such situation would impose an added burden on prison employees and force prison employees to constantly second-guess their employer's ability to maintain potential evidence for possible litigation." *Id.* (quotation omitted); *see also Adkins*, 692 F.3d at 506.  "[T]he more prudent path is to consider instances raising spoliation questions on a case-by-case basis."  *Stanbro*, 2021 WL 3863396, at *7 (quotation omitted); *see also Adkins*, 692 F.3d at 506.

### F.  Appropriate Sanctions

The Court has concluded that (1) the County had an obligation to preserve the footage from Camera 18 and failed to take reasonable steps to do so; (2) this failure to preserve warrants a finding of bad faith and an intent to deprive Plaintiff of evidence surrounding the facts of Joshua Vogt's death at the jail; (3) Plaintiff was prejudiced as a result of the failure; and (4) the County's failure should be imputed to the CO Defendants.  Fashioning an appropriate sanction to address this discovery violation rests within the Court's discretion.  *See Burris*, 787 F.3d at 879; *Stevenson*, 354 F.3d at 745; *Dillion*, 986 F.2d at 267; *see also* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment ("Finding an intent to deprive another party of the lost information's

use in the litigation does not require a court to adopt any of the measures listed in subdivision (e)(2). The remedy should fit the wrong . . . .").

### 1. Adverse-Inference Instruction

Under Rule 37(e)(2) of the Federal Rules of Civil Procedure, "upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," the Court may "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."

Plaintiff requests the terminating sanctions of 37(e)(2)(C), namely, entry of default judgment as to liability against the CO Defendants. "Because there is a 'judicial preference for adjudication on the merits,' the law generally disfavors default judgments." *United States v. Yennie*, 585 F. Supp. 3d 1194, 1198 (D. Minn. 2022) (quoting *Belcourt Pub. Sch. Dist. v. Davis*, 786 F.3d 653, 661 (8th Cir. 2015)). "The entry of default judgment should be a rare judicial act." *Comiskey v. JFTJ Corp.*, 989 F.2d 1007, 1009 (8th Cir. 1993) (quotation omitted); *accord Belcourt Pub. Sch. Dist.*, 786 F.3d at 661. As default judgment is among the harshest of sanctions a court can impose, it is the rare case where a party's misconduct justifies entry of default judgment.

Plaintiff likens the instant case to *Estate of Hill*, in which the district court entered default judgment as a sanction under Rule 37(e)(2). *Estate of Hill* similarly involved alleged deliberate indifference to the medical needs of an individual confined at a county jail resulting in death. 2022 WL 14648630, at *3. The decedent was transferred to a cell used for medical watch a little after 9:00 a.m. and, at 9:30 a.m., the defendant nurse

initiated a medical watch, "direct[ing] corrections officers to check on [the decedent] every 30 minutes." *Id.* at *2. Video from the hallway outside the cell was preserved and produced "for an approximately 32-minute period between 8:43 a.m. and 9:15 a.m. and an approximately 2-hour-and-30-minute period between 4:00 p.m. and 6:30 p.m." *Id.* at *4. The video "for the period between 9:15 a.m. and 4:00 p.m., which is when the documented 30-minute medical watch checks would have occurred and when [the defendant nurse] stated she visited [the decedent]," was not preserved. *Id.*; *see id.* at *5. This video "would have shown the identity of any person that came to [the decedent's] cell on the day of her death, the time at which any visits occurred, and for how long any visit lasted." *Id.* at *5. There was no explanation for why the defendant county "preserv[ed] less relevant video while permitting the destruction of the most relevant video." *Id.* at *12.

The defendants in *Estate of Hill* were a nurse employed by "a private correctional healthcare company to provide medical services to individuals confined at the [county's] jail," the employing correctional healthcare company, and the county. *Id.* at *1. The district court declined to impose an adverse-inference instruction against the county because it would "be unreasonable to expect that jurors" could comply with such an instruction given the "analytical conundrum" created by the nature of the parties. *Id.* at *16. The district court explained:

> The events in the missing video about which the Court would instruct the jury to draw an adverse inference *against [the county]* include the conduct of [the nurse]. Because [the nurse] is acting as an arm of [the county] when providing medical care to detainees and her actions are attributed to [the

county] under the non-delegable duty doctrine, an adverse inference against [the county] can equate to an adverse inference about [the nurse's] conduct. For example, one adverse inference the jury could draw against [the county] is that [the nurse's] account of visiting [the decedent] at 3:00 p.m. is inaccurate. An instruction would permit or require the jury to apply that adverse inference *against [the county]* when evaluating the negligence and § 1983 claims against it. However, the jury would *not* be permitted to apply the same adverse inference about [the nurse's] conduct to the claims *against [the nurse] herself or her employer, [the correctional healthcare company]*. Thus, the jury would be permitted to assume facts that could establish [the nurse's] own liability in negligence and potentially under § 1983 (that she did not check on [the decedent] as she claimed) but would be prohibited from applying that fact to the determination about whether [the nurse] or her employer are liable.

*Id.* (footnotes omitted) (emphasis added).

Here, the loss of the footage from Camera 18 is not of the same magnitude as the loss of the video in *Estate of Hill*. Other footage, such as from Cameras 17 and 19, albeit at different angles, remains available to Plaintiff. Moreover, this case does not suffer from the same "analytical conundrum" present in *Estate of Hill*.

In the alternative, Plaintiff requests an adverse-inference instruction that the jury must infer the footage from Camera 18 was unfavorable to the CO Defendants. "A district court's adverse inference sanction should be carefully fashioned to deny the wrongdoer the fruits of its misconduct yet not interfere with that party's right to produce other relevant evidence." *LaJocies*, 2011 WL 1630331, at *4. There are "three types of adverse inference instructions." *Hall v. Ramsey Cty.*, No. 12-cv-1915 (DSD/LIB), 2013 WL 12141435, at *3 (D. Minn. Apr. 8, 2013); *accord Taylor*, 2019 WL 4673426, at *7.

37

> In its most harsh form, when a spoliating party has acted willfully or in bad faith, a jury can be instructed that certain facts are deemed admitted and must be accepted as true. At the next level, when a spoliating party has acted willfully or recklessly, a court may impose a mandatory presumption. Even a mandatory *presumption*, however, is considered to be rebuttable.
>
> The least harsh instruction *permits* (but does not require) a jury to *presume* that the lost evidence is both relevant and favorable to the innocent party. If it makes this presumption, the spoliating party's rebuttal evidence must then be considered by the jury, which must then decide whether to draw an adverse inference against the spoliating party. This sanction still benefits the most innocent party, in that it allows the jury to consider both the misconduct of the spoliating party as well as proof of prejudice to the innocent party. Such a charge should be termed a "spoliation charge" to distinguish it from a charge where the jury is *directed* to presume, albeit still subject to rebuttal, that the missing evidence would have been favorable to the innocent party, and from a charge where the jury is *directed* to deem certain facts admitted.

*Hall*, 2013 WL 12141435, at *3 (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 470-71 (S.D. N.Y. 2010), *abrogated on other grounds by Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012)); *accord Taylor*, 2019 WL 4673426, at *7.

While Plaintiff moves for a "second-tier" instruction, "[t]he Court finds that a permissive adverse inference instruction is a remedy that is commensurate with the loss of the [footage from Camera 18]." *Jones v. Hirschbach Motor Lines, Inc.*, No. 1:21-CV-01004-MAM, 2022 WL 4354586, at *5 (D. S.D. Sept. 20, 2022). Accordingly, the Court recommends that the parties be allowed to present evidence and argument regarding the loss of the footage from Camera 18 and that the jury be instructed that the County had a

duty to preserve the footage from Camera 18, another County employee at the jail (and not the CO Defendants) failed to preserve the footage from Camera 18, and that the jurors may, but are not required to, infer that the footage from Camera 18 would have been favorable to Plaintiff. *See Mizzoni*, 2017 WL 4284597, at *7; *Pettit*, 45 F. Supp. 3d at 1114; *see also Blazer*, 2019 WL 3494785, at *5; *cf. Jones*, 2022 WL 4354586, at *5.

## 2. Attorney Fees

Plaintiff also requests an award of attorney fees and costs "for all of her efforts to locate the missing video," including bringing this motion. Pl.'s Mem. in Supp. at 26. "In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15cv9363 (ALC) (DF), 2018 WL 1512055, at *9 (S.D. N.Y. Mar. 12, 2018); *accord Jones*, 2022 WL 4354586, at *5 ("Among the available sanctions for ESI spoliation, a court may order the spoliating party to pay the aggrieved party's attorney's fees and expenses relating to the ESI loss."); *see* Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment (noting "[t]he remedy should fit the wrong . . . ."); *see also* Fed. R. Civ. P. 1 (Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"). "[F]ederal courts also have inherent power to award attorneys' fees as a sanction." *Stevenson*, 354 F.3d at 751; *see Schlafly v. Eagle Forum*, 970 F.3d 924, 936-39 (8th Cir. 2020); *see also*

*Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107-11 (2017); *Kelley*, 2022 WL 2801180, at *4; *Estate of Hill*, 2022 WL 1464830, at *17.

In addition to the adverse-inference instruction, the Court recommends that Plaintiff be awarded her reasonable attorney fees and costs that she would not have incurred but for the County's failure to preserve the footage from Camera 18, including those she incurred in connection with the instant motion. The Court further recommends that the amount of such an award be determined by the undersigned upon further briefing following a ruling on this Report & Recommendation.

## IV. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that Plaintiff's Rule 37(e) Motion for Default Judgment and Other Sanctions, ECF No. 57, be **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The Court recommends that Plaintiff's motion be **GRANTED** with respect to the provision of an adverse-inference instruction regarding the footage from Camera 18 as set forth herein as well as an award of reasonable attorney fees and costs for those expenses she would not have incurred but for the County's failure to preserve the footage from Camera 18, including those she incurred in connection with the instant motion.

2. The Court additionally recommends that the amount of such an award be determined by the undersigned upon further briefing following a ruling on this Report & Recommendation.

[Continued on next page.]

3.  The Court further recommends that Plaintiff's motion otherwise be **DENIED**.


Dated: January   30   , 2023                          _s/ Tony N. Leung_
                                                      Tony N. Leung
                                                      United States Magistrate Judge
                                                      District of Minnesota

                                                      _Vogt v. MEnD Correctional Care, PLLC
                                                      et al._
                                                      Case No. 21-cv-1055 (WMW/TNL)


## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).