# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Molly Vogt,
*as Trustee for the Heirs and Next-of-Kin of*
*Joshua Vogt, deceased*,

        Plaintiff,

v.

MEnD Correctional Care, PLLC;
Crow Wing County, Minnesota;
Heath Fosteson, individually and in his
capacity as Crow Wing County Jail
Administrator;
CO Robert Anderson;
CO Raynor Blum;
CO Cherokee DeLeon;
CO Christine Ghinter;
CO Ronald J. Imgrund; and
CO Lukasz Organista,

        Defendants.

Case No. 21-cv-1055 (WMW/TNL)

**REPORT &**
**RECOMMENDATION**

Nicholas Sweeney, Brazil Law Group, 1622 West Lake Street, Minneapolis, MN 55408
(for Plaintiff); and

Jessica Schwie, Kennedy & Graven, Chartered, 150 South Fifth Street, Suite 700,
Minneapolis, MN 55402 (for Defendant COs Robert Anderson, Raynor Blum, and
Ronald J. Imgrund).

# I. INTRODUCTION

This matter is before the Court on Defendant COs Robert Anderson, Raynor Blum, and Ronald J. Imgrund's[1] (collectively, "CO Defendants") *Daubert* Motion to Exclude Plaintiff's Expert Karen Mollner, ECF No. 74, and Motion for Summary Judgement, ECF No. 83. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Wilhelmina M. Wright, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1. ECF No. 73.

A hearing was held. ECF No. 94. Nicholas Sweeney appeared on behalf of Plaintiff Molly Vogt. Jessica Schwie appeared on behalf of the CO Defendants.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that the CO Defendants' summary-judgment motion be **GRANTED** on basis of qualified immunity and their *Daubert* motion be **DENIED AS MOOT**.

---

[1] As the Court previously noted, the CO Defendants are the only remaining defendants in this litigation. *See generally Vogt v. Crow Wing Cty.*, No. 21-cv-1055 (WMW/TNL), 2022 WL 37512 (D. Minn. Jan. 4, 2022) [hereinafter *Vogt I*]; ECF Nos. 22, 25. The CO Defendants are or were employed by Defendant Crow Wing County ("the County") at the time of the events giving rise to this litigation. *See, e.g.*, First Am. Compl. ¶¶ 10, 12-13, 16, ECF No. 67; Answer to First Am. Compl. ¶ 7, ECF No. 71; *see also* Decl. of Jessica Schwie ¶ 1, ECF No. 53 [hereinafter First Schwie Decl.]. Plaintiff brought claims against the CO Defendants in their individual and official capacities as well as against the County. *See generally* First Am. Compl. "A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)); *accord Parrish v. Ball*, 594 F.3d 993, 997 (8th Cir. 2010); *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 n.55 (1978). Thus, Plaintiff's claims against the CO Defendants in their official capacities are essentially claims against the County and therefore subsumed within her claims against the County. *See Thiel v. Korte*, 954 F.3d 1125, 1129 (8th Cir. 2020) ("The official-capacity claim against Korte is essentially a claim against the county itself."). Following a prior motion to dismiss, only Plaintiff's claim against the CO Defendants in their individual capacities remains. *See generally Vogt I*, 2022 WL 37512. Accordingly, although the County has not been formally terminated from this litigation, it is no longer a party for all practical purposes.

Defendant CO Imgrund was a sergeant at the time of the events in question and has since been promoted to lieutenant of jail operations. Imgrund Depo. 6:4-9, 29:19-32:15, 33:12-14. *See infra* n.6 and accompanying text.

## II. BACKGROUND

### A. Death of Joshua Vogt on January 3, 2020

On January 2, 2020, around 11:00 p.m., Joshua Vogt[2] was arrested for an outstanding warrant during a traffic stop. *See generally* Ex. A to Decl. of Nicholas S. Sweeney, ECF No. 90-1.[3] The arresting police officer "knew [Joshua] Vogt to have previous law enforcement contacts involving drugs." Ex. A to Sweeney Decl., ECF No. 90-1 at 3. The arresting police officer observed that Joshua "Vogt did not appear to be currently under the influence." Ex. A to Sweeney Decl., ECF No. 90-1 at 3. The arresting police officer twice searched Joshua Vogt, once on the scene and again when they arrived at the County's jail. Ex. A to Sweeney Decl., ECF No. 90-1 at 2-3.

Joshua Vogt arrived at the County's jail at or around 12:00 a.m. on January 3, 2020. Compilation Video at 00:00-32, ECF No. 70-1.[4] Joshua Vogt was met by Defendant CO Anderson, who conducted a pat search at the jail's threshold before he entered the facility. Compilation Video at 00:32-1:07; Depo. of Ronald J. Imgrund 65:2-

---

[2] Plaintiff is Joshua Vogt's daughter. First Am. Compl. ¶ 6. The Court will use Joshua Vogt's first and last name to avoid confusion with Plaintiff.

[3] *See also generally* Ex. E to First Schwie Decl., ECF No. 53-2 at 122-24 (Depo. Ex. 14). A number of the parties' exhibits are duplicative of one another. *Compare, e.g.*, Ex. A to Sweeney Decl. (January 2, 2020 Nisswa Police Department Incident Report), ECF No. 90-1, *with* Ex. E to First Schwie Decl., ECF No. 53-2 at 122-24 (Depo. Ex. 14) (same). The Court will endeavor to provide a tandem citation to the other side's corresponding exhibit, identifying such exhibit, in a footnote.

[4] The parties have in part relied on existing filings to comprise the relevant record for the CO Defendants' motion for summary judgment. *See, e.g.*, Defs.' Mem. in Supp. at 2 n.1, ECF No. 87; Pl.'s Mem. in Opp'n at 2 n.2, ECF No. 89. One of those things is a compilation video created by the parties following a hearing on a prior motion at the Court's request. *See generally* ECF No. 70-1. At that hearing, the Court noted there were approximately 11 exhibits (Deposition Exhibits 18-A through 18-K contained in Exhibit E to the First Schwie Declaration) consisting of video footage from the jail, which themselves had anywhere from a single video clip to more than 100 video clips in the individual exhibit. The Court inquired as to whether it was technically possible to create a compilation of the video clips that the parties agreed reflected the events in question for the Court's review. This compilation was then provided to the Court following the hearing. Like Plaintiff, the Court cites to the compilation video using "run time" citations versus the timestamps in the frames for ease of reference. *See* Pl.'s Mem. in Opp'n at 2 n.2.

8, Ex. B to Sweeney Decl., ECF No. 90-2:[5] *see* Depo. of Robert Anderson 37:3-41:7, Ex. C to Sweeney Decl., ECF No. 90-3.[6] No contraband was found. Anderson Depo. 45:14-17.

Around 12:05 a.m., Joshua Vogt entered the facility and proceeded to the shower area, out of Defendant CO Anderson's sight for a period of time. Compilation Video at 1:19-23; Imgrund Depo. 67:13-68:8; Anderson Depo. 43:1-20. Defendant CO Anderson joined Joshua Vogt in the shower area and conducted a strip search. Anderson Depo. 43:21-45:13. No contraband was found during this search either. Anderson Depo. 45:14-17. Defendant CO Anderson could not recall whether Joshua Vogt took a shower, but testified he would have watched Joshua Vogt do so if he had. Anderson Depo. 47:21-48:2. Defendant CO Anderson did not recall Joshua Vogt being particularly sweaty during this time, having difficulty holding a conversation, or having difficulty following commands. Anderson Depo. 47:9-20.

By 12:11 a.m., Joshua Vogt had changed into jail-issued clothing. Compilation Video at 2:27-31. After performing some other screening tasks, Defendant CO Anderson escorted Joshua Vogt to a cell known as "Group Holding" in the jail's booking area. Compilation Video at 2:35-2:58; Anderson Depo. 50:9-22. It appears that Joshua Vogt was in "Group Holding" for approximately eight minutes before he began the booking

---

[5] *See generally* Ex. B to First Schwie Decl., ECF No. 53-1 at 22-77.
[6] *See generally* Ex. D to First Schwie Decl., ECF No. 53-1 at 130-62.

process with Defendant CO Blum. *See* Compilation Video at 2:35-2:59; Ex. E to First Schwie Decl., ECF No. 53-8 at 12:12-21 a.m. (Depo. Ex. 18F) [hereinafter Camera 19].[7]

At 12:21 a.m., Joshua Vogt began the booking process with Defendant CO Blum. Compilation Video at 2:59-3:16; *see* Depo. of Raynor Blum 64:21-24, Ex. E to Sweeney Decl., ECF No. 90-5;[8] *see also* Ex. E to First Schwie Decl., ECF No. 53-4 at 30 (Depo. Ex. 19). During the booking process, Defendant CO Blum noticed that Joshua Vogt was sweaty, which he considered "abnormal." Blum Depo. 65:6-11; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 31 (Depo. Ex. 19).

As part of the booking process, individuals are asked whether they had been using drugs. Blum Depo. 65:12-19; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19). Defendant CO Blum testified that it was common for individuals to not be truthful in answering this question. Blum Depo. 65:20-66:7; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19). Defendant CO Blum testified that, when he asked this question, Joshua Vogt told him "that he hadn't taken any drugs; at least recently." Blum Depo. 66:8-12; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19). Blum testified that, based on the "behavior [he] observed including [Joshua Vogt] sweating, also [Joshua Vogt's] fidgety motions, to [him] it appeared more fidgety than [he] would consider normal," and he did not believe that Joshua Vogt was telling the truth. Blum Depo. 66:13-19; *see* Blum Depo. 68:22-24 ("So, coming off the street, I thought he was under the influence of something at the time."), 73:3-4 ("Fidgety,

---

[7] Plaintiff has referred to portions of the jail's Camera 19, which are part of the record, but not included on the Compilation Video. *See* Pl.'s Mem. in Opp'n at 4-5 & n.3. Because of the nature of the video files, *see supra* n.4, the Court has cited to the time stamp at the top of the frame when referring to Camera 19.
[8] *See generally* Ex. C to First Schwie Decl., ECF No. 53-1 at 78-129.

anxious, sweaty."); *see also* Compilation Video at 3:02-5:05; Ex. E to First Schwie Decl., ECF No. 53-4 at 31 (Depo. Ex. 19). Defendant CO Blum testified that Joshua Vogt had "more sweat than [he] would expect from a normal person that just walked in off the street" and would develop "[b]eads of sweat on his forehand that after he wiped away would reappear." Blum Depo. 69:2-14; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 31 (Depo. Ex. 19). Defendant CO Blum described Joshua Vogt's fidgeting as "[r]apid either body twitching or arm movements that don't have a purpose." Blum Depo. 69:15-19. Defendant CO Blum testified that Joshua Vogt's speech was "more on the rapid side," "kind of a stop-and go." Blum Depo. 68:2-10. Defendant CO Blum testified that he encountered Joshua Vogt a handful of times at the jail on prior occasions and Joshua Vogt seemed different this time. Blum Depo. 56:16-57:2, 57:24-59:15, 68:11-14.

Defendant CO Blum followed up with Joshua Vogt regarding his answer, mentioning the fidgeting and sweating. Blum Depo. 70:4-15; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19). Joshua Vogt did not "admit to being on any illegal controlled substances," and "mentioned he has anxiety and takes a medication for it." Blum Depo. 70:23-71:7; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19). Defendant CO Blum testified that while, "some of the behaviors [he observed] could be attributed to anxiety," these behaviors were "not to the extent" exhibited by Joshua Vogt. Blum Depo. 71:8-72:2.

As part of the booking process, Defendant CO Blum completed a booking information sheet. Blum Depo. 118:18-25; *see generally* Ex. F to Sweeney Decl., ECF

No. 90-6.[9]   The information sheet contained a series of questions.   Ex. F to Sweeney Decl., ECF No. 90-6 at 2-3.   The first question was whether Joshua Vogt was "cooperative at the time of booking."   Ex. F to Sweeney Decl., ECF No. 90-6 at 3; *see* Blum Depo. 120:13-17.   Defendant CO Blum checked "Yes."   Ex. F to Sweeney Decl., ECF No. 90-6 at 3; *see* Blum Depo. 120:13-17.   Another question asked whether Joshua Vogt had "any known medical problems."   Ex. F to Sweeney Decl., ECF No. 90-6 at 3; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 31-32 (Depo. Ex. 19).   Defendant CO Blum checked "Yes" and wrote "Anxiety."   Ex. F to Sweeney Decl., ECF No. 90-6 at 3; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19).   As for current medications, Defendant CO Blum checked "Yes" and wrote "Clonopin [sic]."[10]   Ex. F to Sweeney Decl., ECF No. 90-6 at 3; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 31-32 (Depo. Ex. 19); *see also* Ex. F to Sweeny Decl., ECF No. 90-6 at 2 (noting treatment provider for anxiety).

One of the questions asked, "When was the last time you consumed any drugs? What type?"   Ex. F to Sweeney Decl., ECF No. 90-6 at 3; *see* Blum Depo. 121:4-6; Ex. E to First Schwie Decl., ECF No. 53-4 at 32 (Depo. Ex. 19).   Defendant CO Blum checked "Yes," and wrote: "On something right now, but he's unsure what he took.   He's sweating heavily."   Ex. F to Sweeney Decl., ECF No. 90-6 at 2; *see* Blum Depo. 121:14-22.   In response to whether there were any "[b]ehavior [a]bnormalities," Defendant CO

[9] *See generally* Ex. E to First Schwie Decl., ECF No. 53-2 at 162-64 (Depo. Ex. 15).
[10] Klonopin is a brand name for clonazepam, a medication used to treat, among other things, "panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks)."   *Clonazepam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682279 html (last accessed July 28, 2023).

Blum again checked "Yes" and wrote "tremors, sweating profusely." Ex. F to Sweeney Decl., ECF No. 90-6 at 2; *see* Blum Depo. 121:23-13.

The questions on the booking information sheet are numbered 1 through 28 and then 50 through 57. Ex. F to Sweeney Decl., ECF No. 90-6 at 2-3. Defendant CO Blum testified that the "standard procedure was to ask from 1 through 28," and "stop at Question 28." Blum Depo. 123:10-124:2; *see* Imgrund Depo. 85:15-86:10. Question 50 asks whether the individual "need[s] urgent (right now) medical attention." Ex. F to Sweeney Decl., ECF No. 90-6 at 2. This question was not asked of Joshua Vogt. Blum Depo. 123:23-124:2.

In his role as sergeant, Defendant CO Imgrund was the ranking officer in charge of the jail on January 3. Imgrund Depo. 32:24-33:7, 59:9-13; Blum Depo. 100:18-23. If a corrections officer is concerned about an individual, the procedure is to bring that concern to the attention of the sergeant. Imgrund Depo. 58:24-59:8, 96:13-22. It is then up to the sergeant to determine how to handle the situation. Imgrund Depo. 59:14-17. Defendant CO Imgrund had encountered Joshua Vogt "[n]umerous times" in his professional capacity as Joshua Vogt "had been in custody many times, from the time that [Imgrund] was a CO all the way through as—[he] was a sergeant." Imgrund Depo. 62:24-63:11. Defendant CO Imgrund testified that he "had a good relationship" with Joshua Vogt and described Joshua Vogt as "[r]espectful" and a "[l]ow key inmate who didn't cause very many problems." Imgrund Depo. 63:12-14; *see* Imgrund Depo. 87:6-7 ("I haven't known Josh to ever cause a problem.").

At 12:24 a.m., Defendant CO Blum went to talk with Defendant CO Imgrund. *See* Compilation Video at 5:05-19. Based on his observations, Defendant CO Blum was concerned that Joshua Vogt "was high." Blum Depo. 67:2-8. Whether it was during this conversation or during a subsequent conversation they had approximately 10 minutes later, Defendant CO Blum "relayed to [Defendant CO Imgrund his] concerns that [Joshua Vogt] was under the influence of something." Blum Depo. 80:4-13; *see* Blum Depo. 80:14-81:2 ("I'm not specific on timing. You had pointed out the part in the video earlier where it looked like I had walked into the sergeant's office, so I could've told him then. Or I could've told him right after I observed the stumble. At some point during the booking process is when I notified my sergeant that I thought it was abnormal."), 83:10-12 ("The timing, if it was right before he stumbled or after, I don't recall."); *see also* Blum Depo. 76:18-77:1 ("But that [stumbling], in this instance, in conjunction with the sweating and with the what I would call, you know, fidgety, jittery behavior those were all kind of indications as a sum to me that he was under a con—a controlled substance. And enough to the point that it caused me to notify my sergeant."). Defendant CO Blum told Defendant CO Imgrund that he thought Joshua Vogt "was high, really high, shaking like a leaf." Blum Depo. 83:5-9; *see* Blum Depo. 81:3-14; Ex. E to First Schwie Decl., ECF No. 53-4 at 33 (Depo. Ex. 19).

By 12:27 a.m., Defendant CO Blum was back out at the main desk continuing the booking process. *See* Compilation Video at 5:08-5:54; Camera 19 at 12:27 a.m. Joshua Vogt can be seen continuing to dab his brow and shift around. *See* Compilation Video at

5:54-7:29. He also can be seen completing what appears to be paperwork at Defendant CO Blum's direction. *See* Compilation Video at 5:54-7:29.

At 12:34 a.m., Defendant CO Blum directed Joshua Vogt to stand by the wall to have his booking photos taken and Joshua Vogt complied. *See* Compilation Video at 7:29-44; Blum Depo. 73:5-74:5. While turning for the side-profile photo, Joshua Vogt lost his balance and stumbled out of his shoes, catching himself on the wall. Compilation Video at 7:37-7:44; Blum Depo. 74:10-75:5. Joshua Vogt stumbled approximately "six to eight feet." Imgrund Depo. 93:8-94:2. Defendant CO Blum testified that it was "not uncommon" for individuals to "possibly stumble if taking a step backwards during a booking photo." Blum Depo. 76:1-17. Defendant CO Blum testified that, in Joshua Vogt's case, the stumble "was another indication . . . that he was under the influence of something." Blum Depo. 75:10-16; *see also* Blum Depo. 76:1-5 ("I had thought he was under a controlled substance."). It is at this point Plaintiff asserts that Joshua "Vogt was suffering from an obvious medical condition that was worsening during booking before he fell down while having his picture taken at 12:34 [a.m.]." Pl.'s Mem. in Opp'n at 12.

Defendant CO Anderson was present at the main desk the entire time from when Defendant CO Blum began the booking process to when Joshua Vogt stumbled, primarily working at another computer. Compilation Video at 3:00-7:52 (corrections officer wearing black, longer-sleeved undershirt with the sleeves near his elbows). Along with another corrections officer, Defendant CO Anderson went to Joshua Vogt's aid after he stumbled. Compilation Video at 7:29-54; *see also* Camera 19 at 12:30-35 a.m.

At 12:34 a.m., Defendant CO Blum went to Defendant CO Imgrund's office for a second time. Imgrund Depo. 95:6-96:4; Camera 19 at 12:34-36 a.m.; *see* Ex. E to First Schwie Decl., ECF No. 53-4 at 33 (Depo. Ex. 19). While Defendant CO Imgrund could not recall exactly what was said, he testified that Defendant CO Blum "indicated that he thought [Joshua] Vogt was on something and needed help." Imgrund Depo. 95:11-15; *see* Imgrund Depo. 95:16-25; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18). Their conversation lasted approximately two minutes. *See* Camera 19 at 12:34-36 a.m.

At 12:41 a.m., Defendant CO Imgrund exited the office and went in to talk with Joshua Vogt in "Group Holding." Imgrund Depo. 99:10-19; Camera 19 at 12:40-41 a.m.; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 174 (Depo. Ex. 19). Defendant CO Imgrund was in with Joshua Vogt for approximately two minutes. Imgrund Depo. 105:8-14; Camera 19 at 12:41-43 a.m.; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18). Defendant CO Imgrund observed that Joshua Vogt "was shaking and sweating." Imgrund Depo. 99:20-22; *see* Imgrund Depo. 100:25-2 (agreeing Joshua Vogt was "particularly sweaty"); Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18), 174 (Depo. Ex. 19). Defendant CO Imgrund described the shaking as "mostly his legs at this time," "[t]hey were just bouncing up and down, kind of, very anxious." Imgrund Depo. 100:20-24. Defendant CO Imgrund acknowledged he had received "information at some trainings" regarding methamphetamine overdoses, and recalled that "some shaking and—and sweating profusely" would be some of the symptoms. Imgrund Depo. 102:7-14.

Defendant CO Imgrund asked Joshua Vogt if he had taken any drugs and Joshua Vogt "said no."  Imgrund Depo. 99:20-23; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18), 174 (Depo. Ex. 19).  Defendant CO Imgrund then asked Joshua Vogt "how did he explain his behavior."  Imgrund Depo. 99:20-25.  Joshua Vogt told Defendant CO Imgrund that "he thought he was having an anxiety attack" and that he had previously had an anxiety attack "the last time he was arrested."  Imgrund Depo. 100:1-7; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18), 174 (Depo. Ex. 19).

Defendant CO Imgrund "asked [Joshua Vogt] to take some deep breaths."  Imgrund Depo. 100:8-9; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18).  Joshua Vogt "took a number of deep breaths, and the shaking immediately stopped."  Imgrund Depo. 100:9-11; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18).  As they continued talking, Joshua Vogt "started shaking again."  Imgrund Depo. 100:12-14.  Defendant CO Imgrund "reminded him to do the deep breathing," and, when Joshua Vogt "started deep breathing," "the shaking stopped again."  Imgrund Depo. 100:15-19; *see* Imgrund Depo. 10:12-16 ("He—he stopped shaking with the breathing techniques.  When—then when he would stop doing the breathing techniques, he would start shaking again."); *see also* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18).  Throughout the time Defendant CO Imgrund was speaking with him, Joshua Vogt was "very clear in his communications and speaking."  Imgrund Depo. 101:7-8; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Dep. Ex. 18), 173, 175 (Depo. Ex. 19).  Defendant CO Imgrund decided "to help Josh[ua Vogt] to a bed" in an effort to help him

relax by laying down. Imgrund Depo. 106:16-107:21; *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 175 (Depo. Ex. 19).

At 12:46 a.m., Defendant COs Imgrund and Anderson escorted Joshua Vogt from "Group Holding" to "Court Holding 2." Compilation Video at 7:55-8:06; Imgrund Depo. 108:4-8, 109:18-110:12; Anderson Depo. 68:18-25; Blum Depo. 88:1-8, 93:25-95:7; Ex. E to First Schwie Decl., ECF No. 53-3 at 154 (Depo. Ex. 18). Defendant CO Imgrund described Joshua Vogt as "[s]haky and unsteady." Imgrund Depo. 109:9-17. Defendant CO Imgrund testified that the transport technique they used—wherein each man had a hand under one of Joshua Vogt's armpits and another on his waist—was to guard against an individual from falling. Imgrund Depo. 109:22-111:3; *see* Blum Depo. 92:1-93:21, 97:9-98:16.

Defendant CO Imgrund testified that he had not seen Joshua Vogt shake like this before, but dealt with anxiety "a lot in jail" and had seen individuals shake before as well as "a lot of weird things attributed to anxiety." Imgrund Depo. 111:4-20. Defendant Imgrund testified that he again asked Joshua Vogt after he was in "Court Holding 2" whether he had taken drugs that night and Joshua Vogt assured him he had not and that it was just anxiety. Imgrund Depo. 111:21-112:11.

Between 12:48 a.m. and 1:29 a.m., jail staff, including Defendant COs Anderson and Blum, performed well-being checks on Joshua Vogt no fewer than eight times: 12:48, 12:51, 12:56, 12:57, 1:09, 1:13, 1:22, and 1:26. Compilation Video at 8:19-9:57; *see* Imgrund Depo. 113:6-114:9; Anderson Depo. 74:10-23; Blum Depo. 101:11-105:6. These well-being checks consist of looking in on the individual and verifying that the

individual is "alive and not in distress."  Imgrund Depo. 113:17-114:3; *see* Anderson Depo. 74:21-23 (monitoring for "[b]reathing and movement").  Sometimes these checks are logged by scanning a barcode; other times they are not logged.  Imgrund Depo. 114:8-19; Blum Depo. 105:7-10.  Defendant CO Blum testified that he recalled Joshua Vogt "being roughly the same" during his well-being checks, lying down.  Blum Depo. 103:8-22.

At 1:29 a.m., Defendant CO Imgrund was out in the booking area and noticed Joshua Vogt had raised his hand.  Imgrund Depo. 116:10-117:8; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19); *see* Compilation Video at 10:04-34; *see also* Blum Depo. 109:9-25.  Defendant CO Imgrund walked over to check on Joshua Vogt to see if he was okay.  Ex. E to First Schwie Decl., ECF No. 53-3 at 175 (Depo. Ex. 19); *see* Compilation Video at 10:04-34.  Joshua Vogt may have been shaking more at this point.  *Compare* Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19) *with* Imgrund Depo. 117:5-25.  Defendant CO Imgrund asked Joshua Vogt if he could hear him.  Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19).  Joshua Vogt responded that he could, but then "kinda rolled over."  Ex. E to First Schwie Decl., ECF No. 53-3 at 175 (Depo. Ex. 19); *see* Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18); Imgrund Depo. 117:5-13.

Defendant CO Imgrund went in to check on Joshua Vogt and asked again whether he could hear him.  Imgrund Depo. 117:14-16; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19); *see* Compilation Video at 10:29-11:08.

Joshua Vogt's responses became "garbled." Imgrund Depo. 117:14-17; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19). At this point, Defendant CO Imgrund directed that staff "call an ambulance." Imgrund Depo. 117:14-19; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19).

At 1:31 a.m., Defendant CO Imgrund exited "Court Holding 2" and went to call the on-call nurse. Compilation Video at 11:06-18; Imgrund Depo. 118:1-9; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19). Defendant CO Blum and another corrections officer went to "Court Holding 2." Blum Depo. 110:5-20; *see* Compilation Video at 11:19-12:14.

Approximately 30 seconds later, at or about 1:32 a.m., Defendant CO Blum "noticed [Joshua Vogt's] face . . . started turning a bluish color," indicating that he was no longer breathing. Blum Depo. 110:21-25. Joshua Vogt's chest was not moving and he had no pulse. Blum Depo. 111:1-10. Defendant CO Blum radioed Defendant CO Imgrund to tell him that Joshua Vogt stopped breathing. Blum Depo. 111:11-15; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18), 175 (Depo. Ex. 19).

Defendant CO Blum began CPR and Defendant CO Imgrund returned to assist with life-saving measures. Blum Depo. 111:16-114:17; Imgrund Depo. 122:21-123:20, 129:14-130:12. Joshua Vogt "was blueish in color and not breathing on his own." Imgrund Depo. 123:20-23. Defendant CO Blum performed CPR continuously until emergency medical services arrived at approximately 1:38 a.m. Blum Depo. 113:16-19, 116:9-12; Ex. E to First Schwie Decl., ECF No. 53-3 at 155 (Depo. Ex. 18); *see* Compilation Video at 15:25-40.

Emergency medical services took over with life-saving measures. Ex. H to Sweeney Decl., ECF No. 90-8 at 3; Ex. E to First Schwie Decl., ECF No. 53-4 at 95 (Depo. Ex. 20). Tragically, these were not successful and Joshua Vogt was pronounced dead at 2:20 a.m. Ex. H to Sweeney Decl., ECF No. 90-8 at 3; Ex. E to First Schwie Decl., ECF No. 53-4 at 95 (Depo. Ex. 20).

An autopsy was conducted by the Ramsey County Medical Examiner. *See generally* Ex. I to Sweeney Decl., ECF No. 90-9.[11] It was determined that Joshua Vogt died from methamphetamine toxicity. Ex. I to Sweeney Decl., ECF No. 90-9 at 1; Ex. E to First Schwie Decl., ECF No. 53-4 at 131 (Depo. Ex. 22). Two small, plastic, Ziploc-style bags were found in Joshua Vogt's stomach "admixed with white particulate material." Ex. I to Sweeney Decl., ECF No. 90-9 at 1.

**B. Camera 18**

Throughout this litigation, Plaintiff continued to pursue what she believed to be missing video footage. *Vogt v. MEnD Correctional Care, PLLC*, No. 21-cv-1055 (WMW/TNL), 2023 WL 2414551, at *2-7 (D. Minn. Jan. 30, 2023) [hereinafter *Vogt II*], *report and recommendation adopted*, 2023 WL 2414531 (D. Minn. Mar. 8, 2023) [hereinafter *Vogt III*]. It was subsequently determined that the footage from Camera 18, a "booking"-area camera, was not preserved after it had been viewed by the captain of the jail (the jail's administrator) and a Department of Corrections inspector. *Id.* at *6-7.

The Court previously found that "[t]here is no dispute that Camera 18 would have captured at least a partial view of the 'Court Holding 2' cell where Joshua Vogt was for

---

[11] *See generally* Ex. E to First Schwie Decl., ECF No. 53-5 at 1-9 (Depo. Ex. 36).

45 minutes before his condition deteriorated to the point that Defendant CO Imgrund called for emergency medical services." *Id.* at *8. "Camera 18 captured footage different from other cameras in the booking area and would have had a view into the 'Court Holding 2' cell, where Joshua Vogt was leading up to and at the time of his death." *Id.* at *9. "Camera 18 would have captured another perspective of the incident in question." *Id.* at *11 (quotation omitted).

The Court "conclude[d] that the County had a duty to preserve the footage from Camera 18 immediately following Joshua Vogt's death." *Id.* at *8. "The County preserved footage from Cameras 17 and 19 but not Camera 18, which, like Cameras 17 and 19, was also described as a 'booking'-area camera." *Id.* "No explanation—credible or otherwise—ha[d] been offered for why the footage from Camera 18 was available for [the captain of the jail] to review with the Department of Corrections inspector but not preserved with the other footage." *Id.* at *9.

The Court observed that "[n]either the Court nor Plaintiff can know what the footage from Camera 18 showed or how significant that footage was to this litigation," and "[i]t [wa]s impossible to determine precisely what the destroyed footage contained or how severely the unavailability of this footage prejudiced Plaintiff's ability to prove her claim." *Id.* at *11 (quotation omitted). The Court observed that it was possible "[t]he footage may have given the viewer an idea of what was visible during the well-being checks conducted on Joshua Vogt and any deterioration (or lack thereof) in his condition." *Id.* The Court observed that "[i]t [wa]s also possible that the footage from Camera 18 would have showed Joshua Vogt raising his hand and the nature of that

gesture, which is what prompted Defendant CO Imgrund to go into 'Court Holding 2' and ask if he was okay." *Id.*

The Court ultimately found "that a permissive adverse inference instruction [wa]s a remedy commensurate with the loss of the footage from Camera 18," and

> recommend[ed] that the parties be allowed to present evidence and argument regarding the loss of the footage from Camera 18 and that the jury be instructed that the County had a duty to preserve the footage from Camera 18, another County employee at the jail (and not the CO Defendants) failed to preserve the footage from Camera 18, and that the jurors may, but are not required to, infer that the footage from Camera 18 would have been favorable to Plaintiff.

*Id.* at *16 (quotation omitted). The Court also "recommend[ed] that Plaintiff be awarded her reasonable attorney fees and costs that she would not have incurred but for the County's failure to preserve the footage from Camera 18." *Id.* at *17. These recommendations were adopted.[12] *See generally Vogt III*, 2023 WL 2414531.

Plaintiff asserts that Camera 18 would have shown Joshua Vogt in "Group Holding" and "his deteriorating condition," which "necessitate[ed]" him being moved to "Court Holding 2." Pl.'s Mem. in Opp'n at 5; *see also* Pl.'s Mem. in Opp'n at 3, 8.

---

[12] The amount of attorney fees and costs has been addressed in a separate order issued today.

### III. MOTION FOR SUMMARY JUDGMENT

The CO Defendants have moved for summary judgment, asserting, among other things, that they are entitled to qualified immunity.

#### A. Legal Standards

##### 1. Summary Judgment

Under Rule 56(a), courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *accord Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial." *Gannon Int'l*, 684 F.3d at 792.

"To establish a genuine issue of material fact, . . . [the non-moving party] may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in his favor." *Turner v. Mull*, 784 F.3d 485, 489 (8th Cir. 2015) (quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." (quotation omitted)). "To show a genuine dispute of material fact, a party must provide more than

conjecture and speculation." *Rusness v. Becker Cty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quotation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted); *see Anderson*, 477 U.S. at 248-49; *see also, e.g.*, *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011).

On a motion for summary judgment, courts "view the record most favorably to the nonmoving party and draw all reasonable inferences in that party's favor." *Johnson v. Safeco Ins. Co. of Illinois*, 983 F.3d 323, 329 (8th Cir. 2020); *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). Thus, "[a]s the non-moving party, [Plaintiff] is entitled to all reasonable inferences—those that can be drawn from the evidence without resort to speculation." *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) (quotation omitted).

### 2. Deliberate Indifference to Medical Needs

"Prison officials violate the Due Process Clause of the Fourteenth Amendment when they show deliberate indifference to a pretrial detainee's objectively serious

medical needs." *Ivey v. Audrain Cty.*, 968 F.3d 845, 848 (8th Cir. 2020); *accord Reece v. Hale*, 58 F.4th 1027, 1030 (8th Cir. 2023); *see also, e.g.*, *Presson v. Reed*, 65 F.4th 357, 366-67 (8th Cir. 2023); *McRaven v. Sanders*, 577 F.3d 974, 979-80 (8th Cir. 2009); *Vaughn v. Gray*, 557 F.3d 904, 908 n.4 (8th Cir. 2009); *Grayson v. Ross*, 454 F.3d 802, 808 (8th Cir. 2006). "To succeed on this kind of claim, a plaintiff must demonstrate that a pretrial detainee had an objectively serious medical need that the defendants knew of and yet deliberately disregarded." *Ivey*, 968 F.3d at 848; *accord Reece*, 58 F.4th at 1030.

"Deliberate indifference has both an objective and a subjective component." *Vaughn*, 557 F.3d at 908 (quotation omitted); *see, e.g.*, *Ryan v. Armstrong*, 850 F.3d 419, 425 (8th Cir. 2017); *Thompson v. King*, 730 F.3d 742, 746 (8th Cir. 2013); *McRaven*, 577 F.3d at 980. "The objective component requires a plaintiff to demonstrate an objectively serious medical need." *Vaughn*, 557 F.3d at 908. "A medical need is objectively serious if it has been diagnosed by a physician or if it is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Barton v. Taber*, 908 F.3d 1119, 1124 (8th Cir. 2018) [hereinafter *Barton II*] (quotation omitted); *see also, e.g.*, *Ryan*, 850 F.3d at 425.

"The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." *Vaughn*, 557 F.3d at 908. "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [pretrial detainee's] health." *Id.* (quotation omitted); *accord Thompson*, 730 F.3d at 746-47. "This onerous standard requires a showing more

than negligence, more even than gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the [pretrial detainee]." *Thompson*, 730 F.3d at 747 (quotations and citations omitted); *see also, e.g.*, *Presson*, 65 F.4th at 366; *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015); *Vaughn*, 557 F.3d at 908. "Even acting unreasonably in response to a known risk is insufficient to prove deliberate indifference." *Thompson*, 730 F.3d at 474. "[T]he evidence must show that the [defendants] recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk." *Letterman*, 789 F.3d at 862 (quotation omitted); *accord Presson*, 65 F.4th at 367.

"The factual determination that a [defendant] had the requisite knowledge of a substantial risk may be inferred from circumstantial evidence or from the very fact that the risk was obvious." *Presson*, 65 F.4th at 367 (quotation omitted); *see also, e.g.*, *Thompson*, 730 F.3d at 748; *Letterman*, 789 F.3d at 862; *Vaughn*, 557 F.3d at 909. As relevant here, a defendant "manifests deliberate indifference by intentionally denying or delaying access to medical care." *Letterman*, 789 F.3d at 862; *accord Presson*, 65 F.4th at 367; *Vaughn*, 557 F.3d at 909.

### 3. Qualified Immunity

"Qualified immunity shields government officials from liability when their conduct does not violate clearly established rights of which a reasonable person would have known." *Rusness*, 31 F.4th at 614 (quotation omitted); *see also, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Ryan*, 850 F.3d at 424. An analysis of qualified immunity "involves two inquires: (1) whether there has been a violation of a

22

constitutional right; and (2) whether that right was clearly established at the time of the violation." *Rusness*, 31 F.4th at 615; *see also, e.g.*, *Ivey*, 968 F.3d at 849. As applicable to the instant motion for summary judgment, "qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Barton II*, 908 F.3d at 1124. "Courts have the liberty to choose the order of addressing the inquires." *Rusness*, 31 F.4th at 615; *accord Ivey*, 968 F.3d at 849. "The party asserting immunity always has the burden to establish the relevant predicate facts, and at the summary judgment stage, the nonmoving party is given the benefit of all reasonable inferences." *Rusness*, 31 F.4th at 615 (quotation omitted).

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Presson*, 65 F.4th at 369. "This means that existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quotation omitted); *see, e.g.*, *Ivey*, 968 F.3d at 849; *Ryan*, 850 F.3d at 427; *Casler v. MEnD Corr. Care, PLLC*, No. 18-cv-1020 (WMW/LIB), 2020 WL 6886386, at *4 (D. Minn. Nov. 24, 2020). "Showing that a right was clearly established requires identifying controlling precedent with close correspondence to the particulars of the present case." *Rusness*, 31 F.4th at 615; *accord Presson*, 65 F.4th at 369. "This means that the right in question must be construed fairly narrowly and the facts in the present case must align with facts in precedent." *Rusness*, 31 F.4th at 615; *accord Presson*, 65 F.4th at 369; *see Ivey*, 698 F.3d at 849 ("The

Supreme Court has cautioned courts not to define clearly established law at too high a level of generality." (citing *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam)); *see also Ryan*, 850 F.3d at 426-27 ("It is a 'longstanding principle that clearly established law should not be defined at a high level of generality.'" (internal quotation marks omitted) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)); *cf. Casler*, 2020 WL 6886386, at *4.

The Eighth Circuit Court of Appeals has recognized this context-specific focus "in cases involving deliberate indifference to a pretrial detainee's objectively serious medical needs." *Ivey*, 968 F.3d at 849 (citing *Ryan*, 850 F.3d at 426-27); *Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016) [hereinafter *Barton I*]; *accord Presson*, 65 F.4th at 369. "[A]n officer does not lose the protections of qualified immunity merely because he does not react to all symptoms that accompany intoxication." *Thompson*, 730 F.3d at 748. Thus, while the Eighth Circuit has recognized and "deemed it clearly established by 2008 that a pretrial detainee has a right to be free from deliberately indifferent denials of emergency medical care," *Ryan*, 850 F.3d at 427 (quotation omitted), and stated that "a reasonable officer in 2011 would have recognized that failing to seek medical care for an intoxicated arrestee who exhibits symptoms substantially more severe than ordinary intoxication violates the arrestee's constitutional rights," *Barton I*, 820 F.3d at 967, courts must nevertheless engage in a "close examination of the facts to determine what right is at issue and thus whether qualified immunity is appropriate," *Rusness*, 31 F.4th at 615; *accord Presson*, 65 F.4th at 369; *see Ivey*, 968 F.3d at 849; *cf. Reece*, 58 F.4th at 1030.

## B. Analysis

As stated above, it is Plaintiff's position that, as of 12:34 a.m., Joshua Vogt was suffering from an objectively serious medical need when he stumbled while having his booking photo taken and his condition was such that it would have been obvious to a lay person that he needed medical care. The CO Defendants assert that it was not clearly established that Joshua Vogt had an objectively serious medical need as of 12:34 a.m. and, in any event, they were not deliberately indifferent.

### 1. Objectively Serious Medical Need

Between approximately 12:21[13] and 12:34 a.m., Joshua Vogt was observed to be sweating excessively, fidgety/jittery, and speaking rapidly to a degree that Defendant CO Blum did not believe he was truthfully answering questions regarding his drug use and suspected that he was high. Joshua Vogt was cooperative and followed instructions. When his booking photos were taken, Joshua Vogt stumbled several feet, out of his shoes, catching himself along the wall. While Defendant CO Blum suspected that Joshua Vogt was under the influence of a controlled substance, there is no dispute that it was not known that Joshua Vogt had consumed methamphetamine until after his death.

The CO Defendants argue Joshua Vogt's sweating and stumbling are not sufficient for it to have been obvious that he needed medical care, relying on *Jones*. In *Jones*, an inmate was "fine" until told of a transfer to another facility, "at which point she became 'violently sick' and 'uncooperative.'" 512 F.3d at 479. Extra officers were needed to

---

[13] The earliest point in time in which Plaintiff argues Joshua Vogt was exhibiting an objectively serious medical need was when "Defendant [CO] Blum was aware that [Joshua] Vogt was suffering from an obvious medical condition that was worsening during booking before he fell down while having his picture taken at 12:34 AM." Pl.'s Mem. in Opp'n at 12. It is undisputed that Defendant CO Blum began the booking process at 12:21 a.m.

help the inmate exit the vehicle upon arrival and she was "mumbling and exhibiting a blank stare." *Id.* The inmate did not respond to the officers' instructions and, at one point, was described as "grunting and rolling around on the floor." *Id.* at 479-80. She was also breathing rapidly "as if she had been exerting herself." *Id.* Several officers noted that the inmate "had an unpleasant odor, like urine or body odor," and "dried blood on her mouth and lips" was observed during a medical screening. *Id.* at 479-80. The Eighth Circuit held that, based on this combination of symptoms and the fact that the inmate "never expressed a need for medical attention," "a reasonable jury could not find that [the inmate] had a medical need so obvious that a layperson would easily recognize the need for a doctor's immediate attention." *Id.* at 483. The CO Defendants argue that Joshua "Vogt . . . did not even present the more egregious symptoms that were still held not to be enough in *Jones*" and "was able to speak clearly, carry out a conversation, express his own rights (denying drug consumption and need for medical), and generally walking about although he had a stumble and subsequent assist to a cell." Defs.' Mem. in Supp. at 17-18.

Plaintiff likens this case to *Barton* and *Plemmons*. In *Barton*, the arrestee was involved in a single-vehicle accident. *Barton II*, 908 F.3d at 1122. He "could not stand without assistance." *Id.* When the arrestee arrived at the detention center, "he appeared highly intoxicated, his speech was slurred, and he was having trouble standing alone." *Id.* (quotation omitted). "After numerous attempts, [the arrestee] was able to provide only one adequate sample [for testing his blood alcohol concentration], which indicated a blood alcohol concentration of .115." *Id.* When asked to stand beside one of the

deputies, the arrestee "walked over to [the deputy] and held the handrail before collapsing to the ground." *Id.* The deputy "instructed [the arrestee] three times where to sign the document, but [the arrestee] did not seem to understand the instructions, and he did not sign the document." *Id.* The "arrest-disposition report noted that [the arrestee] was under the influence of alcohol and hydrocodone upon his arrival." *Id.* The jail administrator "could not recall whether he had ever run into somebody that was in [the arrestee's] particular shape, and he didn't know if any of his officers had either." *Id.* at 1124 (quotation omitted). Based on the car accident, inability to follow instructions and stand without assistance, "severe intoxication," and "drug ingestion," the Eighth Circuit concluded that "a jury could find that [the arrestee] was experiencing a medical need so obvious that a layperson would recognize that he needed prompt medical attention." *Id.*

In *Plemmons*, the arrestee informed the jail in the morning during booking that he had a history of heart problems, including two heart attacks. 439 F.3d at 820. That afternoon, the arrestee "began suffering chest and arm pain and was sweating profusely." *Id.* The arrestee's cell mate informed jail staff that the arrestee "was ill a number of times via a 'call box' in their cell." *Id.* When one of the jailers came to check on the arrestee, the arrestee told him "he was having heart trouble, but . . . the jailer left without doing anything." *Id.* There was evidence that one of the jailers "dismissed [the arrestee's] symptoms as an anxiety attack." *Id.* at 824.

The arrestee's "condition worsened, and he experienced increased chest pain and nausea." *Id.* at 820. The jailer and another jailer "came back twenty-five minutes after . . . [the] first visit, and the [arrestee] told them he thought he was having a heart attack."

27

*Id.*  The arrestee was taken to the booking area and sat "on a bench while [the jailers] finished processing a prisoner."  *Id.* at 821.  An ambulance was called after the processing was complete, "roughly ten to fifteen minutes after [the arrestee] was removed from his cell, and more than fifty minutes from the time the jailers were first notified of [the arrestee's condition]."  *Id.*

In light of the arrestee telling "the booking officer he was a heart patient, and, roughly six hours later began experiencing classic heart attack symptoms, including arm and chest pain, profuse sweating, and nausea—symptoms corroborated by his cell mate," the Eighth Circuit held "that a genuine fact dispute exist[ed] regarding whether [the arrestee] suffered objectively serious medical needs."  *Id.* at 824.  Based on the fact that the arrestee had notified the jail "he was a heart patient"; "[i]t was patently clear to [the arrestee], [his cell mate], and [a jail trustee who reported the arrestee was having trouble breathing] that [the arrestee] was having a heart attack"; and the arrestee and his cell mate "asked for assistance for at least fifteen to twenty minutes, but possibly for as long as fifty-one minutes," the Eighth Circuit concluded that "any reasonable officer would have known that a delay in providing prompt, appropriate medical care" would violate the arrestee's constitutional rights.  *Id.*

Plaintiff contends that Joshua Vogt's condition went beyond mere intoxication akin to the arrestee's inability to stand in *Barton* and the attribution of his symptoms to anxiety when they should have been easily recognized as a need for medical care is analogous to *Plemmons*.  The Court is hard pressed to conclude that, as of 12:34 a.m., a

lay person would have recognized that Joshua Vogt was exhibiting symptoms substantially more severe than ordinary intoxication and needed medical attention.

In *Grayson*, the jail was told by the arresting officer that "he was 'pretty sure' [the arrestee] was under the influence of some narcotic." 454 F.3d at 806. While paperwork was being completed, the arrestee was "calmly sitting on the bench, coherently answering questions from the jailers about his name, address, date of birth, and social security number." *Id.* "[H]e appeared normal, was responsive and attentive, and did not display any signs that he was having hallucinations." *Id.* Jail staff also called the arrestee's mother, "who explained that [her son] had a history of methamphetamine use." *Id.* When the supervising corporal "asked the arrestee if he had been doing drugs, . . . [the arrestee responded] that he lost his straw." *Id.* The corporal admitted the arrestee, "stating that the jail had booked detainees in worse condition." *Id.* at 807. As to the corporal, the Eighth Circuit concluded that the arrestee's "behavior at the time of intake did not suggest a high degree of intoxication," and, "[c]onfronted with a calm, non-combative person sitting on a bench answering questions, a layperson would not leap to the conclusion that [the arrestee] needed medical attention, even if he were aware that [the arrestee] had taken methamphetamine." *Id.* at 810.

Based on his observations, Defendant CO Blum was concerned that Joshua Vogt was under the influence of drugs and pressed the issue. Joshua Vogt, however, told both Defendant COs Blum and Imgrund that he had not used drugs recently. *Contra McRaven*, 577 F.3d at 978. While Joshua Vogt was sweating heavily, fidgety, and speaking rapidly, and subsequently stumbled while having his photo taken, he was also

coherent, responding appropriately, and following instructions. *See Thompson*, 730 F.3d at 747-48; *Grayson*, 454 F.3d at 809-10; *Kelley v. Pulford*, No. 18-cv-2805 (SRN/TNL), 2020 WL 6064577, at *8-9 (D. Minn. Oct. 14, 2020); *cf. Reece*, 58 F.4th at 1030-31; *contra Barton II*, 908 F.3d at 1124-25; *Thompson*, 730 F.3d at 749. Although still sweating heavily and shaking, Joshua Vogt continued to be clear in his communications when speaking with Defendant CO Imgrund after he stumbled. He told Defendant CO Imgrund that he was having an anxiety attack. *See Ivey*, 968 F.3d at 849-50; *contra Plemmons*, 439 F.3d at 820-21; *Gordon*, 454 F.3d at 860-61. When Joshua Vogt performed deep-breathing exercises with Defendant CO Imgrund, his shaking improved. Nevertheless, for purposes of summary judgment, the Court will assume without deciding that Joshua Vogt was suffering from an objectively serious medical need obvious to a lay person as of 12:34 a.m.

### 2. CO Defendants

The Court next turns to whether a reasonable jury could find that Defendant COs Anderson, Blum, and Imgrund had subjective knowledge of Joshua Vogt's serious medical need and deliberately disregarded it. When considering whether a defendant could be found to have been deliberately indifferent, the Eighth Circuit has distinguished between defendants who "fail[] to take any responsive action," *Vaughn*, 557 F.3d at 909; *see, e.g.*, *Ryan*, 850 F.3d at 426; *Letterman*, 789 F.3d at 863-64; *see also Reece*, 58 F.4th at 1033, and those that take "steps to abate . . . [the] risk of harm," *Letterman*, 789 F.3d at 865; *see, e.g.*, *Reece*, 58 F.4th at 1033-34; *cf. Ivey*, 968 F.3d at 849-50.

The Eighth Circuit's recent decision in *Reece* involved a similar situation to the one faced by Defendant COs Anderson, Blum, and Imgrund. Like Joshua Vogt, Amos Reece was arrested and booked into a county detention facility. 58 F.4th at 1029-30. "Over the next few hours, his medical condition deteriorated to the point that he was taken to a nearby hospital where he died." *Id.* at 1030. Like Joshua Vogt, the autopsy indicated that Reece "had orally consumed methamphetamine within a small plastic bag," which "subsequently opened within [his] stomach, leading to acute methamphetamine toxicity and his subsequent death." *Id.* (quotation omitted). Like Joshua Vogt, Reece "never told anyone at [the county detention facility] about the bag." *Id.*

The arresting officer told jail staff that Reece stated he was thirsty "multiple times during transport and "that even a puddle of rain water would suffice." *Id.* The arresting officer also told jail staff that Reece "was acting as if he was having a seizure in the back of his cruiser" and "was under the influence of methamphetamine."[14] *Id.* Reece likewise told jail staff "that he was very thirsty." *Id.* After being "informed . . . that he had to complete the intake process before [he] could enter the facility," Reece "gave the impression that he understood completely but repeated how thirsty he was multiple times." *Id.* (quotation omitted). Jail staff "informed [Reece] that he needed to sign some forms regarding his property, and [Reece] nodded signifying that he understood and signed both sheets and begged [jail staff] to take him in for a drink of water." *Id.*

---

[14] The parties disputed whether the arresting officer informed jail staff about Reece being under the influence of methamphetamine, "but for purposes of th[e] appeal [the Eighth Circuit] . . . assume[d] that he did." *Reece*, 58 F.4th at 1030.

(quotation omitted). After the booking process was complete, Reece was escorted to a cell and told "that he could drink from the sink there." *Id.*

As relevant here, after having "witnessed [Reece's] booking, [a sergeant] reported that a short while later [Reece's] behavior changed in that he became more obnoxious and his demeanor was more off-putting." *Id.* at 1031 (quotation omitted). The sergeant "also observed that [Reece] was sweating profusely, all over his face, head, arms, chest and back and began making statements about 'just shoot me now.'" *Id.* (quotation omitted). The sergeant "explained that [Reece's] remarks were not of conversation flow but were absurd, random and quickly forgotten when a question was asked in reference to the comment made." *Id.* (quotation omitted). Approximately "two hours after [Reece] was booked into [the facility], he threw his breakfast tray at the cell window a number of times." *Id.* Reece "complied with a deputy's request to stop throwing things and to calm down. About thirty minutes later, however, he threw his tray at the window again and punched the cell wall multiple times." *Id.* at 1031-32. "Concerned that [Reece] might hurt himself, [the sergeant] ordered him placed in a restraint chair in an area that allowed jail staff to monitor [him] better." *Id.* at 1032. Once Reece was situated in the chair, medical personnel were summoned to evaluate him. *Id.*

Like Plaintiff, Reece's mother sued jail employees under 42 U.S.C. § 1983, alleging deliberate indifference to Reece's medical needs. *Id.* at 1029. In considering whether the sergeant was deliberately indifferent to Reece's medical needs in the context of qualified immunity and "whether she should have contacted medical staff earlier in the morning," the Eighth Circuit reasoned:

There is some question, though, whether she should have contacted medical staff earlier in the morning (assuming that would've helped [Reece] anyway), but we don't think the record shows that she was deliberately indifferent to a serious medical need. This isn't a situation where officers essentially ignored an injured inmate for hours as he lay motionless and unresponsive, *see Letterman v. Does*, 789 F.3d 856, 864 (8th Cir. 2015), or failed to seek medical attention even though an inmate had "screamed, howled, and banged his head against the door of his cell for some eight hours." *See Ryan v. Armstrong*, 850 F.3d 419, 425-26 (8th Cir. 2017). The incident report reflects that members of the jail staff, including [the sergeant], checked on [Reece] at least eleven times in the two-and-a-half hours between booking and [the sergeant's] decision to place him in a restraint chair. *Cf. Krout v. Goemmer*, 583 F.3d 557, 569 (8th Cir. 2009). Even though [Reece's] behavior during that time may have been odd, none of the other five nonparty officers who checked on him requested a medical evaluation either. And even though [Reece] was making absurd, random comments and was "obnoxious" and sweating profusely at this time, that doesn't serve to distinguish him from many others who enter the jail under the influence of alcohol or drugs. *See Thompson*, 730 F.3d at 748. He also had no external injuries, nor was he struggling to breathe, bleeding, vomiting, or choking. *See id.* Up to the point a medical evaluation was requested, moreover, [Reece] complied with instructions.

Perhaps [the sergeant] could have done more. But we cannot consider [the plaintiff's] claim through the lens of "hindsight's perfect vision," as she must demonstrate more than mere negligence or "ordinary lack of due care for the prisoner's safety" to succeed on her claim. *See Letterman*, 789 F.3d at 862. The record would not support a finding that [the sergeant's] failure to act differently was a product of deliberate indifference. She is therefore entitled to qualified immunity.

*Id.* at 1033-34.

With this in mind, the Court turns to the CO Defendants and whether a reasonable jury could conclude that they were deliberately indifferent to Joshua Vogt. In doing so, each defendant's conduct must be assessed individually. *Id.* at 1030; *see also, e.g.*, *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006). "When evaluating whether [a defendant] deliberately disregarded a risk, [courts] consider [that defendant's] actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Letterman*, 789 F.3d at 862 (quotation omitted). Courts "must avoid determining the question with hindsight's perfect vision." *Id.* (quotation omitted); *see Reece*, 58 F.4th at 1034.

### a. Defendant CO Blum

From the outset, Defendant CO Blum was concerned that Joshua Vogt was under the influence of a controlled substance. Based on his observations, which he documented during the booking process, Defendant CO Blum pressed Joshua Vogt regarding his drug use. Viewing the record in the light most favorable to Plaintiff, Defendant CO Blum also twice raised his concerns with Defendant CO Imgrund, his supervising officer. *See Letterman*, 789 F.3d at 895 ("Instead, Jennings took other steps to abate Daniel's risk of injury. Jennings began making phone calls to supervisors to determine how to proceed."). Members of the jail staff, including Defendant CO Blum, checked on Joshua Vogt at least 8 times in the approximately 45 minutes between when Joshua Vogt was escorted to "Court Holding 2" and when Defendant CO Imgrund saw him raise his hand. *See Reece*, 58 F.4th at 1033-34.

Viewed in the light most favorable to Plaintiff, Joshua Vogt was sweating profusely, fidgety, and speaking rapidly, and subsequently stumbled several feet while having his booking photo taken. He did not pass out, he was coherent, and he answered questions both before and after he stumbled. *Contra Barton II*, 908 F.3d at 1124-25; *Thompson*, 730 F.3d at 749. "He also had no external injuries, nor was he struggling to breathe, bleeding, vomiting, or choking." *Reece*, 58 F.4th at 1034. While Defendant CO Blum suspected that Joshua Vogt was under the influence of a controlled substance, he did not know what that substance was, how much Joshua Vogt had taken, or when Joshua Vogt had taken it as, despite his questions, Joshua Vogt did not disclose to Defendant CO Blum the information needed to assess accurately his degree of intoxication. *See Grayson*, 454 F.3d at 810; *cf. Thompson*, 730 F.3d at 749; *contra McRaven*, 577 F.3d at 978, 981-82. Arguably, perhaps Defendant CO Blum could have done more—such as taking Joshua Vogt's vitals or not following the chain of command. He did not, however, fail to assess the situation, ignore his observations, or do nothing in response to the circumstances before him. Based on the record before the Court, a reasonable jury could not find that Defendant CO Blum "acted with the culpable state of mind necessary to meet the 'extremely high standard' of deliberate disregard." *Kelley*, 2020 WL 6064577, at *11 (quoting *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016)); *see Reece*, 58 F.4th at 1033-34.

### b. Defendant CO Imgrund

Viewing the evidence in the light most favorable to Plaintiff, Defendant CO Blum twice alerted Defendant CO Imgrund, the supervising officer, that he was concerned

Joshua Vogt was under the influence of a controlled substance and "needed help." Defendant CO Imgrund had encountered Joshua Vogt numerous times in his corrections career and "had a good relationship" with him. From his training, Defendant CO Imgrund knew that shaking and sweating profusely could be signs of a methamphetamine overdose.

Five minutes after Defendant CO Blum left the second time and less than ten minutes after Joshua Vogt stumbled, Defendant CO Imgrund went into "Group Holding" to check on Joshua Vogt. Like Defendant CO Blum, Defendant CO Imgrund observed Joshua Vogt to be sweating profusely and jittery, with his legs shaking. Defendant CO Imgrund had not seen Joshua Vogt shake like this in the past. Like Defendant CO Blum, Defendant CO Imgrund asked Joshua Vogt whether he had taken any drugs and Joshua Vogt told him no. Like Defendant CO Blum, Defendant CO Imgrund pressed Joshua Vogt to explain his behavior in light of that response.

Joshua Vogt told Defendant CO Imgrund that he thought he was having an anxiety attack. *Cf. Ivey*, 968 F.3d at 849-50. Defendant CO Imgrund had Joshua Vogt do some deep-breathing exercises and his shaking improved. Throughout the time Defendant CO Imgrund was speaking with Joshua Vogt, he was coherent and responded appropriately. Defendant CO Imgrund decided to move Joshua Vogt from "Group Holding" to "Court Holding 2" in an effort to try to get him to relax by laying down. As noted above, in the approximately 45 minutes Joshua Vogt was initially in "Court Holding 2," jail staff checked on him at least 8 times.

Just before 1:30 a.m., while out in the booking area, Defendant CO Imgrund noticed that Joshua Vogt had raised his hand and went over to check on him. While Joshua Vogt initially responded to Defendant CO Imgrund, he "kinda rolled over" and his responses became "garbled" when Defendant CO Imgrund went into "Court Holding 2." At this point, Defendant CO Imgrund directed jail staff to call emergency medical services and went to call the on-call nurse.

Viewed in the light most favorable to Plaintiff, Defendant CO Imgrund was informed by Defendant CO Blum twice that he was concerned Joshua Vogt was under the influence of a controlled substance and "needed help." Defendant CO Imgrund observed Joshua Vogt to be shaking and sweating profusely. The shaking he observed was different than his prior interactions with Joshua Vogt and, from his training, Defendant CO Imgrund knew that shaking and sweating profusely could be signs of a methamphetamine overdose.

When Defendant CO Imgrund went in to talk with Joshua Vogt after he stumbled, Joshua Vogt did not pass out, he was coherent, and he answered questions. *Contra Barton II*, 908 F.3d at 1124-25; *Thompson*, 730 F.3d at 749. "He also had no external injuries, nor was he struggling to breathe, bleeding, vomiting, or choking." *Reece*, 58 F.4th at 1034. Joshua Vogt also denied that he was under the influence of a controlled substance when asked by Defendant CO Imgrund. Here again, Joshua Vogt did not disclose the information needed to assess accurately his degree of intoxication. *See Grayson*, 454 F.3d at 810; *cf. Thompson*, 730 F.3d at 749; *contra McRaven*, 577 F.3d at 978, 981-82.

Instead, Joshua Vogt told Defendant CO Imgrund that he was experiencing an anxiety attack. Defendant CO Imgrund observed deep-breathing exercises to have a positive effect on Joshua Vogt's shaking. Defendant CO Imgrund determined that Joshua Vogt should be moved to "Court Holding 2" in an effort to promote relaxation through lying down and an attempt to abate the medical condition Joshua Vogt told him he was experiencing. *See Ivey*, 968 F.3d at 849-50; *Letterman*, 789 F.3d at 865. Here too, perhaps Defendant CO Imgrund arguably could have done more—such as taking Joshua Vogt's vitals, consulting medical personnel, or summoning emergency medical services sooner. He did not, however, ignore Defendant CO Blum's concerns, fail to assess the situation, disregard what Joshua Vogt himself was telling him was happening, or do nothing in response to the circumstances before him. Based on the record before the Court, like Defendant CO Blum, a reasonable jury could not find that Defendant CO Imgrund "acted with the culpable state of mind necessary to meet the 'extremely high standard' of deliberate disregard." *Kelley*, 2020 WL 6064577, at *11 (quoting *Saylor*, 812 F.3d at 644); *see Reece*, 58 F.4th at 1033-34.

### c. Defendant CO Anderson

Defendant CO Anderson conducted the initial pat search before Joshua Vogt entered the facility and subsequent strip search when Joshua Vogt changed into jail-issued clothing. Defendant CO Anderson did not recall Joshua Vogt being particularly sweaty during this time, having difficulty holding a conversation, or having difficulty following commands.

Viewing the evidence in the light most favorable to Plaintiff, Defendant CO Anderson was present during the booking process. Defendant CO Anderson saw Joshua Vogt stumble and went to his aid. After Defendant CO Imgrund talked with Joshua Vogt in "Group Holding," Defendant CO Anderson assisted Defendant CO Imgrund in escorting Joshua Vogt from "Group Holding" to "Court Holding 2." A reasonable jury could find that Defendant CO Anderson was aware of Joshua Vogt's excessive sweating and shaking given his close proximity when Defendant CO Blum was booking Joshua Vogt and his assistance in escorting Joshua Vogt to "Court Holding 2." Like Defendant CO Blum, Defendant CO Anderson was among the members of the jail staff who checked on Joshua Vogt at least 8 times in the approximately 45 minutes between when Joshua Vogt was escorted to "Court Holding 2" and when Defendant CO Imgrund saw him raise his hand. *See Reece*, 58 F.4th at 1033-34.

Again, Joshua Vogt was sweating profusely, fidgety, and speaking rapidly, and subsequently stumbled several feet while having his booking photo taken. He did not pass out, he was coherent, and he answered questions both before and after he stumbled. *Contra Barton II*, 908 F.3d at 1124-25; *Thompson*, 730 F.3d at 749. "He also had no external injuries, nor was he struggling to breathe, bleeding, vomiting, or choking." *Reece*, 58 F.4th at 1034. Like Defendant CO Blum, perhaps Defendant CO Anderson arguably could have done more—such as taking Joshua Vogt's vitals or not following the chain of command. Defendant CO Anderson did not, however, ignore Joshua Vogt when he stumbled or do nothing in response to the circumstances before him. Based on the record before the Court, like Defendant COs Blum and Imgrund, a reasonable jury could

not find that Defendant CO Anderson "acted with the culpable state of mind necessary to meet the 'extremely high standard' of deliberate disregard." *Kelley*, 2020 WL 6064577, at *11 (quoting *Saylor*, 812 F.3d at 644); *see Reece*, 58 F.4th at 1033-34.

### 3. Summary

In sum, having assumed that Joshua Vogt was suffering from an objectively serious medical need that would have been obvious to a lay person at 12:34 a.m. based on his excessive sweating, fidgeting, rapid speech, and stumble, *see supra* Section III.B.1, a reasonable jury could not on this record conclude that by not immediately doing more for Joshua Vogt after he stumbled—whether that was taking vitals, consulting medical personnel, or summoning emergency medical services—the CO Defendants exhibited a state of mind akin to criminal reckless. The absence of footage from Camera 18, though understandably frustrating and disheartening for Plaintiff and Joshua Vogt's family and friends, does not alter the Court's analysis. Even assuming Camera 18 captured at least a partial view of the approximately eight minutes he was in "Group Holding" before Defendant CO Blum began the booking process, Imgrund Depo. 80:21-81:14, Depo. of Heath Fosteson 31:7-20, 35:2-6, Ex. D to Sweeney Decl., ECF No. 90-4,[15] it was the combined observations of Joshua Vogt by Defendant CO Blum during booking and his subsequent stumble that Plaintiff claims would have made it obvious to a lay person that he needed medical care—not before. As the facts viewed in the light most favorable to Plaintiff do not demonstrate that the CO Defendants were deliberately indifferent to Joshua Vogt in violation of his constitutional rights, the CO Defendants are entitled to

---

[15] *See generally* Ex. A to First Schwie Decl., ECF No. 53-1 at 1-21.

qualified immunity and the Court recommends that their motion for summary judgment be granted on that basis. *See Barton II*, 908 F.3d at 1124; *see also Reece*, 58 F.4th at 1033-34. Because the Court has concluded that the CO Defendants are entitled to qualified immunity, the Court declines to address their causation argument and additionally recommends that their *Daubert* motion be denied as moot.

## IV. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. The CO Defendant's Motion for Summary Judgement, ECF No. 83, be **GRANTED** on the basis of qualified immunity.

2. The CO Defendant's *Daubert* Motion to Exclude Plaintiff's Expert Karen Mollner, ECF No. 74, be **DENIED AS MOOT**.

Dated: July____28____, 2023

_____*s/ Tony N. Leung*_____
Tony N. Leung
United States Magistrate Judge
District of Minnesota

*Vogt v. MEnD Correctional Care, PLLC et al.*
Case No. 21-cv-1055 (WMW/TNL)

## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).