United States Court of Appeals

For the Eighth Circuit

_____

No. 23-3359
_____

Molly Vogt, as Trustee for the Heirs and Next-of-Kin of Joshua Vogt, deceased

*Plaintiff - Appellant*

v.

MEnD Correctional Care Inc.

*Defendant*

Crow Wing County, Minnesota; Heath Fosteson, Individually and in his capacity as Crow Wing County Jail Administrator; CO Robert Anderson; CO Raynor Blum; CO Cherokee DeLeon; CO Christine Ghinter; CO Ronald J. Imgrund; CO Lukasz Organista

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: May 9, 2024
Filed: August 16, 2024
_____

Before COLLOTON, Chief Judge, BENTON and SHEPHERD, Circuit Judges.
_____

BENTON, Circuit Judge.

Joshua A. Vogt died of a drug overdose while detained in a county jail. His daughter, Molly Vogt, sued under 42 U.S.C. § 1983, claiming that three officers deliberately disregarded his medical condition. The magistrate judge recommended summary judgment for the officers. The district court[1] agreed. Vogt appeals, arguing that a pending adverse-inference instruction against the officers creates a material factual dispute whether the officers deliberately disregarded Mr. Vogt's medical condition. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

Joshua Vogt was arrested on January 2, 2020. According to the arresting officer's report, Mr. Vogt "behave[d] normally through the entire stop" and "did not appear to be . . . under the influence."

Arriving at the Crow Wing County Jail around midnight, Mr. Vogt was strip-searched. No drugs were found. Officers stated he was "cooperative and responsive." At some point before the search, Mr. Vogt had swallowed two bags of methamphetamine.

At 12:21 a.m., Officer Raynor Blum began booking Mr. Vogt. Observing him sweating, fidgeting, and shaking, Blum repeatedly asked if he was on drugs. Mr. Vogt denied being on drugs, explaining the symptoms as part of an anxiety episode. At 12:34 a.m., he stumbled and about ten minutes later, required assistance moving to his individual holding cell (Holding Cell 2). Vogt never asked for medical attention.

Since Blum believed that Mr. Vogt was on drugs, he reported the behavior to Sergeant Ronald J. Imgrund. Imgrund talked with Mr. Vogt, who denied he was on drugs, again blaming a panic attack. Imgrund performed breathing exercises with

---

[1]The Honorable Wilhelmina M. Wright, United States District Judge for the District of Minnesota, now retired, adopting the report and recommendations of The Honorable Tony N. Leung, United States Magistrate Judge.

-2-

him to help him calm down. The officers testified that once he was in his holding cell at 12:46 a.m., they performed "no fewer than eight" wellness checks.

At 1:29 a.m., Imgrund saw Mr. Vogt raising his hand. Finding him on his back shaking, the officers ordered an ambulance. Within minutes, he was no longer breathing. Officers conducted CPR. Mr. Vogt was pronounced dead at 2:20 a.m.

Footage from Camera 18—showing Mr. Vogt's (about) eight-minute stay in Group Holding and an angle of his (about) hour in Holding Cell 2—was not preserved. Mr. Vogt's daughter, Molly Vogt, sued, claiming that the officers deliberately disregarded her father's medical condition. She also alleged that the county had not disclosed all relevant footage. Finding that the county had intentionally destroyed Camera 18's footage, the magistrate judge recommended a permissive adverse-inference instruction, allowing (but not requiring) the jury to "infer that the footage from Camera 18 would have been favorable to Plaintiff." *See* ***Francis v. Franklin***, 471 U.S. 307, 314 (1985) ("A permissive inference suggests to the jury a possible conclusion to be drawn . . . but does not require the jury to draw that conclusion."), *modified*, ***Boyde v. California***, 494 U.S. 370, 378-79 (1990).

The officers moved for summary judgment, invoking qualified immunity. The magistrate judge recommended granting summary judgment, because, even with the spoliation inference, the testimony and available videos would not allow a jury to find that the officers deliberately disregarded Vogt's medical condition. The district court adopted all the recommendations. Vogt appeals, contending that the spoliation inference defeats summary judgment.

II.

"This court reviews de novo a grant of summary judgment." ***Torgerson v. City of Rochester***, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Summary

-3-

Appellate Case: 23-3359    Page: 3    Date Filed: 08/16/2024 Entry ID: 5424988

judgment is proper where the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.*

To establish a § 1983 medical indifference claim, the plaintiff must show that officers acted with "deliberate indifference to a pretrial detainee's objectively serious medical needs." ***Ivey v. Audrain Cnty.***, 968 F.3d 845, 848 (8th Cir. 2020). "Deliberate indifference has both an objective and a subjective component." ***Vaughn v. Gray***, 557 F.3d 904, 908 (8th Cir. 2009), *quoting* ***Butler v. Fletcher***, 465 F.3d 340, 345 (8th Cir.2006). "To succeed on this kind of claim, a plaintiff must demonstrate that a pretrial detainee had an objectively serious medical need that the defendants knew of and yet deliberately disregarded." ***Ivey***, 968 F.3d at 848. *See also* ***Thompson v. King***, 730 F.3d 742, 750 (8th Cir. 2013) ("The Supreme Court has declared that it is unconstitutional for prison officials to act deliberately indifferent to an inmate's serious medical needs."), *citing* ***Estelle v. Gamble***, 429 U.S. 97, 104-05 (1976). "A medical need is objectively serious if it has been diagnosed by a physician as requiring treatment or if it is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." ***Barton v. Taber***, 908 F.3d 1119, 1124 (8th Cir. 2018) (internal quotations omitted). "In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the [detainee's] health." ***Vaughn***, 557 F.3d at 908 (internal quotation omitted). "This onerous standard requires a showing more than negligence, more even than gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the [detainee]." ***Thompson***, 730 F.3d at 747 (internal quotations omitted).

On appeal, Vogt argues that the adverse inference, combined with the record evidence, would allow a rational jury to find that the officers were deliberately indifferent to Mr. Vogt's objectively serious medical need, precluding summary judgment. The magistrate judge assumed "for purposes of summary judgment . . . that Joshua Vogt was suffering from an objectively serious medical need obvious to a lay person. . . ." Relying heavily on *Reece v. Hale*, 58 F.4th 1027 (8th Cir. 2023),

-4-

the magistrate judge concluded, however, that there was no genuine issue of material fact that any of the officers deliberately disregarded Mr. Vogt's medical condition. *See* **Reece**, 58 F.4th at 1034 ("Perhaps [the officer] could have done more. But we cannot consider [plaintiff's] claim through the lens of hindsight's perfect vision, as she must demonstrate more than mere negligence or ordinary lack of due care for the prisoner's safety to succeed on her [deliberate indifference] claim.") (internal quotations omitted). *See also id.* at 1033 (finding qualified immunity for a deliberate-disregard claim where even though "[t]here is some question . . . whether [the officer] should have contacted medical staff earlier," "we don't think the record shows that [the officer] was deliberately indifferent to a serious medical need" because "[t]his [wasn't] a situation where officers essentially ignored an injured inmate for hours as he lay motionless and unresponsive" and "[t]he incident report reflects that members of the jail staff . . . checked on [the detainee] at least eleven times . . . .").

Analyzing each of the three officers separately, the magistrate judge concluded:

- "Arguably, perhaps Defendant CO Blum could have done more—such as taking Joshua Vogt's vitals or not following the chain of command. He did not, however, fail to assess the situation, ignore his observations, or do nothing in response to the circumstances before him. Based on the record before the Court, a reasonable jury could not find that Defendant CO Blum "acted with the culpable state of mind necessary to meet the 'extremely high standard' of deliberate disregard." *Kelley* [*v. Pulford*], 2020 WL 6064577, at *11 [(D. Minn. Oct. 14, 2020)] (quoting *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016)); *see Reece*, 58 F.4th at 1033-34."

- "[P]erhaps Defendant CO Imgrund arguably could have done more—such as taking Joshua Vogt's vitals, consulting medical personnel, or summoning emergency medical services sooner. He did not, however, ignore Defendant CO Blum's concerns, fail to assess the situation, disregard what Joshua Vogt

-5-

Appellate Case: 23-3359   Page: 5   Date Filed: 08/16/2024 Entry ID: 5424988

himself was telling him was happening, or do nothing in response to the circumstances before him. Based on the record before the Court, like Defendant CO Blum, a reasonable jury could not find that Defendant CO Imgrund "acted with the culpable state of mind necessary to meet the 'extremely high standard' of deliberate disregard." *Kelley*, 2020 WL 6064577, at *11 (quoting *Saylor*, 812 F.3d at 644); *see Reece*, 58 F.4th at 1033-34."

- "[P]erhaps Defendant CO Anderson arguably could have done more—such as taking Joshua Vogt's vitals or not following the chain of command. Defendant CO Anderson did not, however, ignore Joshua Vogt when he stumbled or do nothing in response to the circumstances before him. Based on the record before the Court, like Defendant COs Blum and Imgrund, a reasonable jury could not find that Defendant CO Anderson "acted with the culpable state of mind necessary to meet the 'extremely high standard' of deliberate disregard." *Kelley*, 2020 WL 6064577, at *11 (quoting *Saylor*, 812 F.3d at 644); *see Reece*, 58 F.4th at 1033-34."

The magistrate judge then considered the impact of the adverse inference instruction on these three conclusions. The magistrate judge correctly reasoned: "The absence of footage from Camera 18, though understandably frustrating and disheartening for Plaintiff and Joshua Vogt's family and friends, does not alter the Court's analysis."

Vogt emphasizes that a permissive adverse inference permits a jury to "hypothesize[]" what the missing evidence would have shown, in the context of the evidentiary record, to "create a genuine dispute of material fact." **Auer v. City of Minot**, 896 F.3d 854, 858 (8th Cir. 2018).[2]

---

[2]As the separate opinion notes, an adverse inference instruction can defeat summary judgment when coupled with sufficient record evidence. To do so, however, it must "create a genuine dispute of material fact on at least some of [plaintiff's] claims." *Auer*, 896 F.3d at 858. An adverse inference instruction

-6-

Appellate Case: 23-3359     Page: 6     Date Filed: 08/16/2024 Entry ID: 5424988

As hypotheses, Vogt argues, "The jury could conclude, for example, that Mr. Vogt experienced more severe symptoms than the officers disclosed in their testimony, such as cardiac distress (e.g., clutching at his chest), delirium, or an inability to stay upright or conscious." Camera 18's view into Holding Cell 2 was partly obscured by the partitioned wall and door. The top halves of the wall and door are glass, while the lower halves are solid, obstructing a view of the floor and bed. Even if Camera 18 could capture some hypothesized footage, it would not allow an inference that "the officers recognized that a substantial risk of harm existed *and* knew that their conduct was inappropriate in light of that risk," when considering the rest of the record. **Letterman v. Does**, 789 F.3d 856, 862 (8th Cir. 2015) (emphasis in original), *quoting* **Krout v. Goemmer**, 583 F.3d 557, 567 (8th Cir. 2009). "When evaluating whether an [officer] deliberately disregarded a risk, [courts] consider [the officer's] actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Id.* (internal quotation omitted). Here, throughout his detention, individual officers repeatedly checked on Mr. Vogt, questioned him about his condition (he replied he was having an anxiety attack), moved him to a private holding cell, reported his behavior to superiors, performed exercises with him to calm him down, and called for emergency medical help when his condition worsened. Any hypothesis about Camera 18's footage would fail to satisfy the "onerous standard" of culpability required for a deliberate indifference claim. **Thompson**, 730 F.3d at 747.

Courts "must avoid determining the question [of deliberate indifference] with hindsight's perfect vision." **Letterman**, 789 F.3d at 862 (internal quotation omitted). As in *Reece*, the officers did not "essentially ignore[] an injured inmate for hours"

---

"standing alone" is insufficient to defeat summary judgment. **Kronisch v. United States**, 150 F.3d 112, 128 (2d Cir. 1998). As discussed in this opinion, the district court was correct in finding that the record evidence (even when combined with the plaintiff's posited hypotheses) does not support a conclusion that the officers deliberately disregarded a risk to Mr. Vogt's medical condition.

Appellate Case: 23-3359     Page: 7     Date Filed: 08/16/2024 Entry ID: 5424988

or "fail[] to seek medical attention even though an inmate had screamed, howled, and banged his head." *Reece*, 58 F.4th at 1033 (where officers repeatedly checked on Mr. Reece while detained). "Perhaps [officers Blum, Imgrund, and Anderson] could have done more. But we cannot consider [Vogt's] claim through the lens of hindsight's perfect vision." *Id.* at 1034 (internal quotation omitted). Based on the officers' conduct throughout the detention, any hypothesis about Camera 18's (obstructed) view into Holding Cell 2 would not permit a reasonable jury to conclude that the officers' conduct reached the "onerous standard" of deliberate indifference, "requir[ing] a showing more than negligence, more even than gross negligence." *Thompson*, 730 F.3d at 747.

The district court properly granted summary judgment to the officers.

\* \* \* \* \* \* \*

The judgment is affirmed.

SHEPHERD, Circuit Judge, dissenting.

"An adverse inference instruction is a powerful tool in a jury trial. When giving such an instruction, a federal judge brands one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury." Morris v. Union Pac. R.R., 373 F.3d 896, 900 (8th Cir. 2004). Here, by affirming the district court's grant of summary judgment to defendants based on qualified immunity, the majority renders this "powerful tool" meaningless. Because I think an adverse-inference instruction, if it is to mean anything at all, must be given its proper weight in the context of the summary judgment record, I dissent.

The district court determined that an adverse-inference instruction was warranted, making the specific findings—which defendants do not challenge on appeal—that the County had an obligation to preserve the footage from Camera 18 following Joshua Vogt's death; that the County failed to take reasonable steps to preserve the footage; that the County acted in bad faith, evidenced by the fact that

-8-

Appellate Case: 23-3359   Page: 8   Date Filed: 08/16/2024   Entry ID: 5424988

the jail administrator knew the video footage would be relevant to any investigation and litigation and that footage from other cameras in the area was preserved while the footage from the camera with the most relevant angle was not; and that, while neither the district court nor Molly Vogt could know what the footage from Camera 18 would show and how beneficial it would be to her case, Camera 18 would have captured another perspective of the incident, and Molly Vogt was prejudiced by the County's failure to preserve it. While the district court ruled that an adverse-inference instruction was appropriate, the critical inquiry remains how entitlement to an adverse-inference instruction intersects with consideration of a motion for summary judgment. The district court and the majority conclude that the adverse-inference instruction "does not alter the . . . analysis," which I believe is in error.

This Court has not directly addressed the interplay between entitlement to an adverse-inference instruction and the consideration of a summary judgment motion; however, it has recognized that an adverse-inference instruction should carry some weight and factor into the summary judgment analysis. Auer v. City of Minot, 896 F.3d 854, 858 (8th Cir. 2018) ("[I]f [plaintiff] was entitled to the presumption she sought, it was premature to grant summary judgment without evaluating whether the presumption itself could create a genuine dispute of material fact on at least some of [plaintiff's] claims."). Other courts have addressed the issue directly, concluding that the existence of an adverse-inference instruction, coupled with other record evidence—even circumstantial—can defeat summary judgment. See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) (stating that "[a]lthough we believe, like the district court, that a jury might be skeptical of plaintiff's claim that he was drugged by [a CIA officer], we also believe, contrary to the district court, that a jury should be permitted (but not required) to draw an adverse inference against [the officer] based on the destruction of MKULTRA documents," and concluding that, "when combined with the possibility that a jury would choose to draw such an adverse inference, plaintiff's circumstantial evidence that he may have been one of the victims of the CIA's drug tests was enough—barely enough, but enough nonetheless—to entitle him to proceed to trial"); Van Winkle v. Rogers, 82 F.4th

370, 382 (5th Cir. 2023) (reversing grant of summary judgment because "[a]n inference of spoliation, in combination with some (not insubstantial) evidence for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment" (citation omitted)).

Here, I believe Molly Vogt has presented sufficient evidence to defeat summary judgment. This is not a case where the adverse-inference instruction is the sole basis for the claim. See Kronisch, 150 F.3d at 128 ("We do not suggest that the destruction of evidence, standing alone, is enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim."). Molly Vogt points to record evidence of Joshua Vogt's deteriorating condition, including that Vogt was observed acting strangely at the time he was booked; that officers suspected he was under the influence due to his fidgeting, sweating, and rapid speech; that he stumbled while having his booking photo taken; that he had to be helped into the holding cell; and that at some point, he signaled officers for help before becoming unresponsive. Viewing this evidence in the light most favorable to Molly Vogt, combined with the adverse-inference instruction, a jury could conclude that Joshua Vogt had an observably deteriorating condition and that the destroyed footage from Camera 18 shows that Vogt exhibited additional symptoms that were visible to officers, demonstrating that he was suffering from a serious medical need of which officers were aware but deliberately disregarded. See Ryan v. Armstrong, 850 F.3d 419, 425 (8th Cir. 2017) ("In order to succeed on a deliberate indifference claim, a pretrial detainee must show that he 'suffered from an objectively serious medical need' and that one or more defendants 'had actual knowledge of that need but deliberately disregarded it.'" (citation omitted)). This is "enough" to entitle Molly Vogt to proceed to trial. See Kronisch, 150 F.3d at 126.

The majority references Molly Vogt's "hypotheses" about what Camera 18's footage would show, concluding that there is no hypothesis that would allow a reasonable jury to conclude that the officers were deliberately indifferent. But this conclusion invades the province of the jury in considering the adverse-inference

instruction: if we accept the majority's speculation about what the destroyed video does or does not show, then the adverse-inference instruction is rendered a nullity. This cannot be the case, as entitlement to an adverse-inference instruction requires a finding of intentional destruction of evidence and prejudice to the opposing party, see Lincoln Composites, Inc. v. Firetrace USA, LLC, 825 F.3d 453, 463 (8th Cir. 2016), and the remedy for this conduct, in the form of the instruction, must have some effect in order to be a remedy at all.

In sum, I believe the grant of summary judgment to defendants makes the adverse-inference instruction meaningless. I would reverse the district court on the basis that the adverse-inference instruction, coupled with the record evidence, precludes qualified immunity because it creates a material factual dispute about whether the defendants were deliberately indifferent to Joshua Vogt's serious medical needs. I respectfully dissent.

_____